**Joshua MEADOWS, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee.**

No. 49A02–0204–CR–346.

Court of Appeals of Indiana.

March 31, 2003.

Kimberly A. Jackson, Marion County Public Defender Agency, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Cynthia L. Ploughe, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

SULLIVAN, Judge.

Following a jury trial, Joshua Meadows was convicted of two counts of Possession of a Firearm by a Serious Violent Felon (Aiding and Abetting), a Class B felony,[1] and False Informing, as a Class B misdemeanor.[2] He presents several issues for our review, which we renumber and restate as:

I. Whether the trial court erred in admitting certain evidence;

II. Whether the presence of several uniformed police officers in the courtroom violated his right to a fair trial; and

III. Whether the trial court erred in sentencing.

We affirm the convictions but remand for reconsideration of the sentences.

The facts relevant to this appeal include many issues which were not before the jury due to the nature and circumstances surrounding the crime in which the firearms in question were used. In 2001, Meadows purchased two firearms. On April 23, 2001, he purchased an SKS rifle from an Indianapolis gun dealer. When Meadows went to purchase the SKS, he was accompanied by Allen Dumperth, who had been convicted of robbery and could not legally possess a firearm.[3] Meadows filled out the necessary paperwork in order for the purchase to take place, and the store clerk performed the required background check.[4] Meadows left the store

---

1. Ind.Code § 35–47–4–5 (Burns Code Ed. Supp.2002); Ind.Code § 35–41–2–4 (Burns Code Ed. Repl.1998).

2. Ind.Code § 35–44–2–2 (Burns Code Ed. Supp.2002).

3. Indiana Code § 35–47–4–5 prohibits the knowing or intentional possession of a firearm by an individual who has been convicted of robbery.

4. Before a firearm may be sold to an individual who does not possess a handgun permit, a dealer must perform a background check and

after the sale was put on "delay" status pending a further review by the FBI before the sale could be completed. Meadows and Dumperth returned to the store on April 26 to pick up the SKS after Meadows learned that he had passed the background check. Meadows acknowledged that on several occasions, he and Dumperth shot the SKS for target practice.

On August 22, 2001, Meadows, at the urging of Dumperth, went to purchase a second firearm from a different dealer. Meadows decided to purchase an AK–47 rifle and paid for it with money that he had received from Dumperth. Once again, Meadows filled out the necessary paperwork for the background check to be conducted. The sale was put on "delay" status and Meadows and Dumperth left the store. They returned to pick up the AK–47 a few hours later after Meadows was informed that the background check had been completed.

Sometime shortly after Meadows purchased the AK–47, he gave it to Dumperth. Meadows claimed that he asked Dumperth to return the AK–47, but that Dumperth refused, saying that the AK–47 belonged to him. On September 12, 2001, Dumperth asked Meadows whether he could borrow the SKS for the purpose of target shooting. Meadows gave him the SKS, giving him possession of both of Meadows' firearms.

On September 17, Dumperth was involved in a police chase and shooting in which Deputy Jason Baker of the Marion County Sheriff's Department was shot and killed and a bystander was seriously injured. Dumperth also died during the shootout. Both the SKS and the AK–47 which belonged to Meadows were used in the shooting. The AK–47 was recovered in Dumperth's automobile, and the SKS was found a short distance from where Dumperth's automobile had crashed. Meadows was not personally involved in the shooting and was not in Dumperth's automobile during the chase.

Meadows learned that Dumperth had been involved in the shooting and, on September 18, called 911 to report that his firearms had been stolen. Deputy Thomas George of the Marion County Sheriff's Department went to Meadows' apartment to fill out a report. On September 20, Meadows again called 911 and stated that he believed that his firearms may have been used in the shooting of Deputy Baker. At that time, Deputy Charles Smith was dispatched to Meadows' apartment. Deputy Smith met with Meadows, but did not question Meadows about the firearms because he was instructed by Detective–Sergeant Douglas Scheffel of the Marion County Sheriff's Department that he was to only "make small talk." Transcript at 160. Sergeant Scheffel informed Deputy Smith that he and Detective–Sergeant Mike Perkins would come to Meadows' apartment to interview him.

After arriving at Meadows' apartment, Sergeant Scheffel and Meadows sat in Sergeant Scheffel's car so that some prelimi-

---

have the customer fill out a form required by the federal government. The store clerk then calls the information into a check center which conducts an instant background check on the customer. The instant check can result in the check center telling the clerk to "proceed," in which event the transaction is completed at that point. The check center may also tell the clerk that the transaction is "denied," which occurs when the purchaser cannot legally own a firearm. The check center may also put the sale on "delay" status, which occurs when the instant background check reveals some information indicating that a person may not be permitted to possess a firearm. When a sale is put on "delay" status, the FBI has three business days to complete a detailed background check before a sale may be completed.

nary information could be gathered about Meadows and the purported theft. Meadows then accompanied Sergeant Scheffel and Sergeant Perkins to the Sheriff's Department where he was interviewed in more detail for the purpose of making a taped statement. Sergeant Scheffel was joined by Detective–Sergeant Paul Arkins of the Indianapolis Police Department who was on special assignment to the Bureau of Alcohol, Tobacco and Firearms. Meadows confessed that he had lied about the firearms being stolen and admitted that he had given them to Dumperth. Meadows was then advised of his Miranda rights and subsequently signed the advisement of rights form and a waiver of those rights prior to giving a taped statement.

## I

### Admission of Evidence

■■■■ The admission of evidence is a matter within the sound discretion of the trial court. *Hyppolite v. State,* 774 N.E.2d 584, 592 (Ind.Ct.App.2002). The decision to admit evidence will not be reversed absent a showing of manifest abuse of discretion resulting in the denial of a fair trial. *Id.* An abuse of discretion occurs when a decision is clearly against the logic and effect of the facts and circumstances before the trial court. *Id.* In reviewing the admissibility of evidence, we consider only the evidence in favor of the trial court's ruling and any unrefuted evidence in the defendant's favor. *Id.*

### A. Statement to Police

Meadows asserts that the trial court erred in allowing into evidence the statement which he gave to the police. He contends that he was "in custody" at the time he gave the initial statement which occurred prior to his being advised of his Miranda rights. He further asserts that the taped statement, which was given after he was informed of his Miranda rights,

was inadmissible as the "fruit of the poisonous tree."

■■■■ The Miranda warnings were designed to secure a criminal defendant's right against compulsory self-incrimination. *Davies v. State,* 730 N.E.2d 726, 733 (Ind.Ct.App.2000), *cert. denied by* 532 U.S. 945, 121 S.Ct. 1410, 149 L.Ed.2d 352 (2001). A defendant is entitled to receive Miranda warnings when he is subject to custodial interrogation. *Id.* The prosecution may not use statements which stem from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Custodial interrogation occurs when questioning is initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. *Id. See also Morales v. State,* 749 N.E.2d 1260, 1265 (Ind.Ct.App.2001). If a reasonable person in the same circumstances would not feel free to leave, a criminal defendant is deemed to be in custody. *Morales,* 749 N.E.2d at 1265.

While Meadows claims that he was in custody prior to the advisement of his Miranda rights, a detailed analysis of when Meadows was "in custody" is unnecessary for resolution of this case because Meadows does not direct this court to the use of any pre-Miranda statements as evidence at trial. Our review of the record also leads us to conclude that any information discussed at trial which was garnered before Meadows received his rights occurred before a reasonable person would conclude that they were in custody. Therefore, the sole issue remaining regarding the use of any statements was whether the taped statement which was given after Meadows was advised of his Miranda rights was

admissible. For purpose of this review, we will accept Meadows' contention that information was acquired from him in violation of his rights.[5] In so doing, we will decide whether the post-Miranda statement was admissible or whether it was the "fruit of the poisonous tree" as Meadows claims, and therefore, inadmissible.[6]

The "fruit of the poisonous tree" doctrine finds its beginning in *Wong Sun v. U.S.*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). As discussed by the United States Supreme Court in *Oregon v. Elstad*, 470 U.S. 298, 306, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), the *Wong Sun* Court held that evidence and witnesses discovered as a result of a search in violation of the Fourth Amendment must be excluded from evidence. The *Elstad* Court determined that the "fruit of the poisonous tree" doctrine did not control in a situation in which the "fruit" of a non-coercive Miranda violation is the accused's own voluntary statement. 470 U.S. at 308, 105 S.Ct. 1285. Although the pre-Miranda statement is inadmissible, the admissibility of any subsequent post-Miranda statement turns upon whether the statement was knowingly and voluntarily made. *Id.* at 309, 105 S.Ct. 1285.

 The State bears the burden of proving beyond a reasonable doubt that the confession was voluntary and not induced by violence, threats, promises, or other improper influences so as to overcome the free will of the accused at the time the confession is made. *Davies*, 730 N.E.2d at 732. In reviewing the voluntariness of a confession, we consider the totality of the circumstances. *Id.* In so doing, we may consider such factors as police coercion, the length, location, and continuity of the interrogation, and the defendant's maturity, education, physical condition, and mental health. *Miller v. State*, 770 N.E.2d 763, 767 (Ind.2002). Based upon the totality of the circumstances, we must determine whether the police conduct overbore the defendant's will. *Id.* at 767–68.

Meadows' sole claim to the involuntariness of his statement is based upon the references about Meadows' pre-Miranda statements made by Sergeant Arkins during questioning for the taped statement. He also states that whether officers exploit the pre-Miranda statements to pressure the suspect into waiving his right to remain silent is a factor which has been considered in determining the admissibility of a post-Miranda statement. It is true that the *Elstad* Court, in determining that

---

**5.** Indeed, our review of the record indicates that Meadows was in custody long before he was informed of his Miranda rights. While a detailed list of the factors leading to this conclusion is possible, it is unnecessary as that conclusion has no effect upon our holding.

**6.** In his reply brief, Meadows makes the assertion that the State has "waived" any claim that the taped statement was admissible when taken after Meadows received an advisement of his rights. Appellant's Reply Brief at 3. His reasoning for this is that the State mentioned this issue in the summary of the argument but failed to mention it in the argument portion of its brief. The State did make several references in its argument to the fact that Meadows received a Miranda warning after

his story changed, but we do agree that the State did not develop the argument as fully as it could have. In this case, the State chose to focus upon whether or not Meadows was in custody. Nonetheless, the State's failure in this regard is not fatal. It is Meadows' argument that the post-Miranda statement is "fruit of the poisonous tree." In order for us to consider that argument and either accept or reject it, we must examine the factual circumstances of the case and apply applicable law to those facts. We are not compelled to accept Meadows' argument merely because the State does not directly and specifically make a counter-argument. Accordingly we consider and discuss the validity of the "poisonous tree" argument.

a post-Miranda statement was admissible under facts nearly identical to those present here, stated that the officers in that case did not exploit the unwarned admission to pressure the respondent into waiving his right to remain silent and giving the second statement. 470 U.S. at 316, 105 S.Ct. 1285. However, we do not take this statement to mean that the officers cannot reference the initial statement which was obtained in violation of Miranda, but rather, that the officers may not use the statement to threaten or coerce the defendant into giving the second statement. Instead of being the sole determinative factor of whether the second statement was involuntary, whether the officers reference the prior statement in interrogating the defendant is to be viewed as one of many factors considered in the totality of the circumstances.

In this case, Meadows voluntarily gave the taped statement and it was not the result of police coercion. The State entered into evidence the "Advice of Rights and Waiver of Rights" form which was signed by Meadows. Exhibits at 26. At the beginning of the taped statement, Sergeant Arkins informed Meadows of his rights and Meadows verified that he understood and that he was waiving his rights. These waivers are highly probative of a statement being made voluntarily. *See Elstad,* 470 U.S. at 318, 105 S.Ct. 1285 (stating that the fact that a suspect chooses to speak after being informed of his rights is highly probative of voluntariness). Sergeant Arkins then proceeded to ask Meadows a series of questions related to the information which Meadows provided before he received his Miranda warnings. While references were made to what Meadows had previously said, Sergeant Arkins did not use the statements in such a manner as to be threatening or coercive, but to provide guidance and clarification for the information which Meadows was freely offering. Under these circum-

stances, we conclude that the taped statement was freely and voluntarily given.

We find support for this determination in *Miller,* 770 N.E.2d at 768–70. In *Miller,* our Supreme Court held that a statement was voluntary and not coerced when the defendant gave a taped statement after being advised of his rights. *Id.* at 770. In that case, defendant voluntarily went to the police station to "clear up" what was being reported on television about his connection to a murder. After arriving at the police station, the defendant waited in a locked interview room for approximately two hours before being questioned. He was questioned for approximately one hour before becoming a suspect and being informed of his rights. However, no waiver of rights was secured at that time. The officer continued to conduct the interview for several more hours until 1:00 a.m. when the officer took a 45 minute break. At this time, the defendant was given a soda and allowed to use the restroom. The defendant was left alone in the room for 45 minutes until the officer returned, placed defendant under arrest, and once again informed him of his rights. The officer then conducted a videotaped interview of defendant and questioned him about his connection to a murder. Our Supreme Court held that under these facts, in addition to other considerations of the manner of questioning and defendant's physical and mental state, the incriminating statements were voluntarily given. *Id.*

Just as in *Miller,* the trial court did not err in allowing into evidence the taped statement given by Meadows after he was informed of his Miranda rights. Meadows agreed to waive his rights and the actions of Sergeant Arkins in securing such waiver do not indicate that he overbore Meadows' will. Meadows freely answered the questions which were posed to him, and when

Meadows disagreed with Sergeant Arkins' characterization of the information which was provided by him before he received his Miranda rights, Meadows made his disagreement known. Under the totality of the circumstances, Meadows' post-Miranda taped statement was freely and voluntarily given.

### B. Evidence of Dumperth's Acts

■ Meadows asserts that the trial court erred in admitting into evidence information concerning some of the events surrounding the chase and shooting in which Dumperth was involved but Meadows was not.[7] He contends that the evidence was irrelevant, or in the alternative, that if the evidence was relevant, its probative value was outweighed by its prejudicial effect.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ind. Evidence Rule 401. Evidence which is not relevant is inadmissible. Ind. Evidence Rule 402. Indiana Evidence Rule 403 provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.

Meadows claims that he and the State stipulated for the purpose of trial that Dumperth was in possession of the firearms on September 17 and 18, 2001, and that the "rifle" was recovered by the police from Dumperth. Appellant's Brief at 16. The stipulation, which was entered as State's Exhibit 26, addresses only the SKS and makes no reference to the AK–47. Therefore, to the extent that Meadows argues that the evidence surrounding the possession of the AK–47 was stipulated to, his argument must fail.[8]

The State elicited testimony that police had responded to a police chase and a shooting. Witnesses stated that the AK–47 was recovered from the backseat of Dumperth's car after it had crashed into a home. One of the officers who was present at the location where the SKS was recovered also testified that the magazine on the SKS, which held thirty rounds, was empty.[9] This was a modification to the SKS because it was sold with a ten-round magazine. The jury was further informed that Dumperth had purchased a thirty-round magazine, and additionally, that while ownership of the magazine is not illegal, its use in a firearm is prohibited. The State also presented evidence that Dumperth had purchased a stock[10] which

7. The trial court granted a motion in limine filed by Meadows which excluded any evidence with respect to the deaths of Dumperth and Deputy Baker. However, the trial court did not limit references to the remainder of the events as they unfolded on the night of September 17 as Meadows requested. The trial court ruled that the State could present evidence which was "so intertwined with this case to establish the conduct and [the State's] theory of the case." Tr. at 23.

8. It is not clear why the stipulation to Dumperth's possession was only to the SKS. Prior to trial, during the hearing on the motion in limine, Meadows' counsel stated that he believed that there would be a stipulation that Dumperth was in possession of both firearms.

However, we have been directed to no other stipulation with respect to the AK–47. Therefore, we assume that no stipulation was entered as to the AK–47.

9. Meadows claims that there was testimony that the magazine to the AK–47 was also empty. However, the testimony to which Meadows has directed this court states, "There was ammo—or I should say bullets inside the magazine." Tr. at 113.

10. A stock is defined as "the wooden part into which the barrel, receiver, and action of a rifle or shotgun are fitted and by which the piece is held for firing." Webster's Third New International Dictionary 2246 (1976).

had been placed upon the SKS. The State also spent considerable time inquiring into the capabilities of the rifles, including the distance at which they would be lethal to a human and their general use. The testimony which was elicited included that the caliber of the ammunition used in the SKS had "harvested more animals than probably any cartridge in the country," that the SKS had a lethal range of four or five hundred yards, and that the SKS was not used for urban self-defense because bullet penetration was too high and the bullets could easily pass through multiple layers of drywall. Tr. at 212.

The State alleges that the references to the police chase and shooting were necessary to explain why defendant contacted the police and lied to the police about his firearms being stolen. The State also asserts that the evidence that Dumperth had bought parts for the firearms indicates that he was the "true owner" of the guns and was not merely "borrowing" them. Appellee's Brief at 12.

The State's contentions have merit. The fact that Meadows believed that his firearms had been used in the commission of a crime and that he subsequently lied to police about the firearms being stolen is relevant to how Dumperth came into possession of the firearms, i.e., whether Meadows actually aided Dumperth in gaining possession of the firearms. We also agree with the State that some limited evidence of the events of the police chase and shooting help to explain why Meadows changed his story to police and that it supports a finding of guilt. It is also relevant that Dumperth purchased a magazine and a

stock for the rifles as it could be indicative of ownership of the firearms and would belie Meadows' claim that the firearms were stolen or only loaned to Dumperth. Consequently, these facts may have indicated that Meadows purchased the firearms not only at Dumperth's urging, but for Dumperth.

However, the testimony indicated that the stock and the thirty-round magazine were purchased for the SKS. As previously noted, the parties stipulated that the SKS was in the possession of Dumperth; therefore, the presentation of additional evidence regarding the "true ownership" of the SKS was not crucial to establishing Dumperth's possession of the SKS and had no relevance to proving that Dumperth was a serious violent felon,[11] or that Meadows aided and abetted Dumperth in possessing the SKS.[12]

We are additionally concerned by some other evidence which was presented to the jury. The discussion of the capabilities of the firearms has very little probative value for a finding of guilt in this case and could be viewed as prejudicial. In fact, the capabilities of the rifles are not relevant for the purpose of the State proving that Dumperth was a serious violent felon who knowingly or intentionally possessed a firearm. Common sense dictates that in some cases the types of firearms which a defendant or a cohort possesses and the capabilities of those firearms may be relevant to the crime charged. However, in this case, the only information necessary for the jury to have made its determination on

11. Dumperth's status as a serious violent felon was established by evidence of his conviction for robbery.

12. In order to prove that Dumperth was a serious violent felon in possession of a firearm, the State was required to show that Dumperth: (1) was a serious violent felon, (2) who knowingly or intentionally, (3) possessed a firearm. I.C. § 35–47–4–5. In order to find Meadows guilty of possession of a firearm by a serious violent felon, the State had to prove that Meadows knowingly or intentionally aided, induced or caused Dumperth to violate I.C. § 35–47–4–5. *See* I.C. § 35–41–2–4.

guilt was that Dumperth possessed the firearms, not the capability of the firearms or how those firearms were ultimately used. In fact, the State was precluded from presenting evidence that Deputy Baker or Dumperth were killed. Had evidence of their deaths been admissible for establishing guilt for some crime charged, the capabilities of the firearms may have been important for showing such things as intent or purpose, or that the firearms possessed were capable of inflicting the type of injury caused in the manner in which it occurred. However, such is not the case here.

Meadows also challenges the prosecutor's statement during closing argument that the incident began at 8 p.m. on September 17, but that the on-scene investigation was still ongoing in the early morning hours of September 18. The State argued that this was significant because Meadows called the police to falsely report that his firearms had been stolen at 7 a.m. on September 18 while detectives were still involved in the collection of the firearms at the scene. The prosecutor then stated that Meadows acted so quickly because of his guilty knowledge and because he was attempting to cover the trail that would lead the police to him as the purchaser of the firearms. These statements, in addition to those by the police officers who testified about the chase which led to the discovery of the firearms, seem proper in that they set the stage for why Meadows had a reason to lie. The references were not inappropriate. However, our inquiry does not end there.

It has been said that hindsight is 20/20, and in this case, that appears to be most true. The testimony of the store clerk where the SKS was purchased indicated that the SKS was used for target practice

and hunting, that most people purchase the thirty-round magazine to use for target shooting, that the SKS was lethal at a long distance, and that the caliber of ammunition used is very popular among hunters. In and of itself, this information does not seem prejudicial; in fact, it seems very benign and possibly non-condemning towards Meadows. However, what these facts say about the capabilities of the firearms, how they can be modified to be illegal, the repeated references to the police chase and shooting, that the magazine to the SKS was empty when found, and the prosecutor's comments during closing argument had to set into motion in the minds of the jurors a scenario in which a serious and gruesome crime was committed. This is the exact situation which the trial court was attempting to prevent by excluding any information concerning the deaths of Deputy Baker and Dumperth. As such, the references to the capabilities of the firearms, the modification of the SKS, and that the SKS magazine was empty when found should not have been allowed. Nonetheless, even though the information should not have been admitted at trial, the error may still be harmless.[13]

■■ The improper admission of evidence is harmless error when the reviewing court is satisfied that the conviction is supported by substantial independent evidence of guilt so that there is no substantial likelihood that the challenged evidence contributed to the conviction. *Morales,* 749 N.E.2d at 1267. To determine that the error did not contribute to the verdict, we determine whether the error was unimportant in relation to everything else the jury considered on the issue in question. *Id.*

---

**13.** While we have determined that the evidence should not have been presented to the jury during the trial, this evidence was prop-

erly before the trial court for use in sentencing. We address the use of this evidence for sentencing in Part III, *infra.*

Meadows stipulated that Dumperth was in possession of the SKS. The evidence presented indicated that the AK–47 was retrieved from Dumperth's car following the police chase and Meadows admitted that he gave possession of the AK–47 to Dumperth several days after the AK–47 was purchased. The evidence established that Dumperth was a serious violent felon because of a prior robbery conviction. The jury could also infer from the admission of Meadows, both in his taped statement and testimony, that he provided the firearms to Dumperth and that he was aware that Dumperth could not legally possess the firearms. These facts comprise substantial independent evidence of guilt and lead to the conclusion that there is no substantial likelihood that the erroneously admitted evidence contributed to the verdict. Therefore, the admission of the challenged evidence was harmless.

## II

### Police Presence in the Courtroom

 Meadows contends that he was denied his right to a fair trial, as provided by the Sixth and Fourteenth Amendments, because of the heavy police presence in the courtroom. He alleges that the trial court's order that the number of uniformed officers in the courtroom be restricted to ten was inadequate and that all officers except those necessary for security purposes should have been excluded from appearing in uniform. In addition, Meadows asserts that even if the order allowing up to ten uniformed officers in the courtroom was proper, the trial court erred by failing to follow the procedure set forth in *Williams v. State,* 690 N.E.2d 162, 169–70 (Ind.1997), which must be utilized when a trial court places restrictions upon public access to the court.

 A long recognized fundamental right of the accused is the right to a public trial. *Id.* at 167. Along with the protec-

tions afforded to the defendant, it also implicates the First Amendment right of the press and the right of the public to attend a criminal trial. *Id.* However, complete or partial exclusion of the public may be justified if a court finds that closure is essential to preserve higher values and is narrowly tailored to serve that interest. *Id.* Central to the right to a fair trial as provided by the Sixth and Fourteenth Amendments is the principle that one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial. *Holbrook v. Flynn,* 475 U.S. 560, 567, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986). However, this does not mean that every practice which tends to single out the accused from everyone else in the courtroom must be struck down. *Id.* Whenever a courtroom arrangement is challenged as inherently prejudicial, the question is not whether jurors actually articulated a consciousness of some prejudicial effect, but rather, whether an unacceptable risk is presented of impermissible factors coming into play. *Id.* at 570, 106 S.Ct. 1340. In determining whether the presence of uniformed officers was inherently prejudicial, we employ a case-by-case analysis. *Id.* at 569, 106 S.Ct. 1340.

In challenging the trial court's order, Meadows asserts that there was a continuous flow of uniformed officers in and out of the courtroom. He also points to his trial counsel's statement to the court that there were anywhere from five to seven uniformed officers in the courtroom at one time. Meadows also notes that other officers in plain clothes sat in the courtroom. Additionally, he alludes to the fact that one juror recognized a red-haired woman sitting in the gallery as working for the Sheriff's Department. Moreover, he alleg-

es that the woman was sitting next to Deputy Baker's father, who attended the entire trial.

We fail to see how the presence of plain-clothed officers, Deputy Baker's father, or the woman who one juror recognized has any impact upon our review of whether the trial court erred in allowing up to ten uniformed police officers to be present in the courtroom. Meadows has not provided any information which would lead us to conclude that the jury could recognize the plain-clothed officers as members of a police force or that Deputy Baker's father was recognized. It is also important to note that the juror who recognized the lady who worked for the Sheriff's Department stated that they did needlepoint together on a few occasions and that their association would not have any impact upon her ability to be fair and impartial.

Turning to whether Meadows was prejudiced because of the presence of the uniformed officers in the courtroom, we conclude that he was not. It is true, as Meadows has stated, that a roomful of uniformed and armed policeman may pose a threat to a defendant's chances of receiving a fair trial. *See Holbrook,* 475 U.S. at 570–71, 106 S.Ct. 1340. However, while several challenges have been made to uniformed officer presence in a courtroom, few cases have reached the conclusion that such police presence has resulted in an unacceptable risk to the defendant. *Compare id.* at 570–72, 106 S.Ct. 1340 (holding that presence of four uniformed state troopers in addition to two Deputy Sheriffs and six Committing Squad Officers, who normally supplied courtroom security personnel, was not so inherently prejudicial as

to impose an unacceptable threat to defendant's right to a fair trial), *and Lambert v. State,* 743 N.E.2d 719 (Ind.2001) (holding that defendant did not receive ineffective assistance of trial counsel when counsel failed to object to presence of uniformed officers in the courtroom because the facts revealed that the jurors faced away from the gallery and there was no evidence that the officers made an effort to prejudice the jury or caused any disturbance), *cert. denied by* 534 U.S. 1136, 122 S.Ct. 1082, 151 L.Ed.2d 982 (2002), *and Holifield v. State,* 572 N.E.2d 490 (Ind.1991) (holding that presence of usual number of necessary guards as well as several new recruits of the Indiana State Police did not prejudice the defendant) *with U.S. v. Rios Ruiz,* 579 F.2d 670 (1st Cir.1978) (holding that trial court did not abuse its discretion by excluding three police officers in uniform from the courtroom but allowing their presence out of uniform). In this case, Meadows has not demonstrated that there was an unacceptable risk that the jury may have been prejudiced by the presence of the uniformed officers. The trial court did not abuse its discretion by allowing up to ten uniformed officers to be present in the courtroom at one time.

We also conclude that Meadows' argument that the trial court failed to follow our Supreme Court's mandate by not providing the reasons for excluding members of the public or other persons is without merit.[14] In *Williams,* our Supreme Court required that a trial court "make a finding that specifically supports any measures taken beyond *what is customarily permitted* that are likely to affect unfet-

---

**14.** Implicit in the argument is an assertion that by permitting so many uniformed and plain-clothed law enforcement officers in the courtroom, members of the public or the media or others entitled to view our criminal justice system were necessarily excluded. However, Meadows turns that implicit argu-

ment upon its head by his contention that the trial court erred in not stating its reasons for limiting the number of uniformed officers to ten. This seems to suggest that he had a right to a courtroom filled with uniformed officers. Yet the limitation of the number of officers was in response to Meadows' own motion.

tered access by the press and public to the courtroom." 690 N.E.2d at 169 (emphasis supplied). The *Williams* Court specifically limited the trial court's responsibility to make findings regarding the burdens and benefits of excluding members of the public from the courtroom when the action taken goes beyond what is customarily permitted. There is little doubt that trial courts are permitted to exclude uniformed members of police forces in order to provide a defendant with a fair trial. Indeed, as has been shown, the exclusion or restriction of the numbers of uniformed police officers present in the courtroom is proper and may be necessary in some situations.

Moreover, the *Williams* Court did not indicate what form was specifically required for the trial court's findings in ordering that certain individuals be excluded or restricted from presence in the courtroom. In this case, the record indicates that the trial court stated that it was granting Meadows' motion to limit the number of uniformed police officers because of a ruling of the United States Supreme Court which dealt with the issue.[15] The trial court also noted that it would not exclude anybody from the courtroom and that any number of officers could be present as long as the number of uniformed officers was ten or less. This number was determined to be appropriate after the trial court considered that the gallery held approximately sixty people. Were findings necessary, we conclude that the trial court's statements were sufficient to indicate that the court considered the necessity of Meadows receiving a fair trial and that of keeping open access to the courtroom.

**15.** The trial court did not indicate upon which ruling of the Supreme Court of the United States it was relying. Suffice it to say, however, that the position of the Supreme Court

## III

### *Sentencing*

■ Meadows asserts that the trial court erred in applying certain aggravating circumstances to two counts and in ordering that the sentences run consecutively. Meadows also contends that his sentence is manifestly unreasonable. At sentencing, the trial court stated:

"As to aggravating circumstances the Court will find aggravating circumstances. The Court is going to find aggravating the nature and the circumstances of the weapons used in this case. I think it would be a different story, maybe if we where [sic] here talking about a couple nine millimeters or a couple of thirty-eights, not that they don't all have extreme power, but that were sold or given to co-defendants in this case. These are killing devices and that's all they are. You look at them and by their very nature they frighten people to look at them. And so the Court is going to consider that as an aggravating circumstance. The Court will also consider the nature and circumstances of the crime committed and the course of the conduct, I think, State, is probably a more apropos aggravator and that's what the Court will find. The Court will note, as has been repeated in many of the letters this Court has received, as well as through Mr. Baker, as well as what this Court sat and heard, is that Mr. Meadows'—his actions put in motion a horrible incident, the worst of incidents in which a police officer lost his life and which an innocent citizen, sitting on the porch, just hanging out or who knows what doing, talking to friends, is going to be incapacitated for the rest of

is clear that a significant presence of uniformed officers in a courtroom may raise issues for concern. *See Holbrook,* 475 U.S. at 570–71, 106 S.Ct. 1340.

his life and there's not too much more aggravating that you can get than that. The Court is also going to find as aggravating imposition of a reduced sentence or suspension of his sentence and the imposition of probation would depreciate the seriousness of the crime. And the facts of the crime are particularly heinous as previously discussed and the crime was designed to effect [sic] the public and it was directed to the public at large. The Court believes the aggravating circumstances far outweigh any mitigation in this case. As to the Meadows' [sic] family I'd like to show leniency on your son but in a situation like this I do not believe that leniency is warranted. An officer lost his life, a citizen lost their life or was severely injured as a result of this. So as to Count One—actually Count Five, serious violent felon in possession of a firearm, the Court is going to sentence the Defendant to twenty years. The Court is aggravating that sentence based on the fact of the nature and circumstances of the crime committed as previously discussed, that's the aggravator the Court is using to aggravate that sentence on Count Five to twenty years. As to Count Six, the Court is going to sentence the Defendant to twenty years and that will be aggravated due to the fact that, as stated previously the Court has found as aggravating, imposition of a reduced sentence or suspension of this sentence would depreciate the seriousness of the crime, in fact, the crime was heinous and it was designed to effect [sic] the public and directed at the public at large. The Court will run those two sentences consecutive, based on the nature of the weapons, as an aggravating circumstance, and a total sentence will be forty years." Tr. at 590–92.

Meadows contends that the trial court erred in enhancing Count Five on the ground of the nature and circumstances of the crime committed and in enhancing Count Six based upon the reasoning that the imposition of a reduced sentence or suspension would depreciate the seriousness of the crime. Meadows also asserts error in the trial court ordering that the sentences be served consecutively based upon the nature of the weapons.

▆▆▆▆▆ Sentencing decisions rest within the sound discretion of the trial court and will be upheld absent an abuse of that discretion. *Hatchett v. State,* 740 N.E.2d 920, 928 (Ind.Ct.App.2000), *trans denied.* Indiana Code § 35–38–1–7.1 (Burns Code Ed. Supp.2002) governs the use of aggravating and mitigating circumstances and enumerates specific factors upon which the trial court may rely in sentencing. *Hatchett,* 740 N.E.2d at 928. Meadows first contends that the trial court erred in considering the nature and circumstances of the various other crimes committed by Dumperth on September 17. The trial court considered that Deputy Baker was killed and that an innocent bystander was injured. In Meadows' view, this evidence applies solely to the specific crimes which Dumperth and his cohorts committed, for which the associates were charged, and not the crimes for which Meadows was charged.

▆▆▆▆▆ In being charged and convicted of the crime of being a serious violent felon in possession of a firearm, Meadows was convicted based upon his actions of aiding Dumperth in possessing the firearms. A defendant may be convicted as a principal to the crime when that individual aided or abetted another in the perpetration of the crime. *Sanquenetti v. State,* 727 N.E.2d 437, 441 (Ind.2000). According to I.C. § 35–41–2–4, an individual who aids another in committing a crime is as guilty as the individual who committed the crime. *Sanquenetti,* 727 N.E.2d at 441.

Indiana Code § 35–38–1–7.1 requires that the trial court consider the nature and circumstances of the crime committed when determining what sentence to impose. Here, Meadows assisted Dumperth in acquiring the firearms which were used during a police chase and shooting. Moreover, because Meadows has been convicted of a crime which was actually committed by Dumperth, all acts by Dumperth which involved use of the firearms are relevant to the sentencing of Meadows because they are inextricably linked to the fact that Meadows put the guns in the hands of Dumperth knowing him to be a convicted felon. The trial court did not err in considering the nature and circumstances of the crimes committed by Dumperth while using the firearms purchased by Meadows.

█ We agree with Meadows' contention that the trial court erred in considering as an aggravator that the imposition of a reduced sentence or suspension of the sentence would depreciate the seriousness of the crime. As stated by our Supreme Court in *Pickens v. State,* 767 N.E.2d 530, 533 (Ind.2002), this factor may be used only to support the refusal to impose a sentence less than the presumptive. While it is true that Meadows requested that he receive a sentence less than the presumptive, the trial court could only use this aggravator to refuse that request, not to use that request to then enhance the sentence to the maximum based upon this aggravator.

█ In challenging the trial court's reliance upon the nature of the weapons, Meadows argues that the possession of a firearm is an element of the crime for which he was convicted, and therefore, the trial court could not rely upon the nature of the firearms as an aggravator. Meadows also notes that all firearms are "killing devices" in the sense that they can be used to kill people and/or animals.

Addressing Meadows' first contention with regard to the elements of the crime, the law is clear that the trial court may not use a material element of the offense as an aggravating circumstance. *See Stewart v. State,* 531 N.E.2d 1146, 1150 (Ind.1988). A material element of the crime for which Meadows was convicted is the possession of a firearm. *See* I.C. § 35–47–4–5. However, the trial court did not rely solely upon the fact that firearms were possessed, but upon the types of firearms possessed. As the State contends, the trial court relied upon the "particularized circumstances of the factual elements of the crime." Appellee's Br. at 19. According to our Supreme Court's decision in *Stewart,* a trial court may rely upon the "particularized individual circumstances which constitute separate aggravating factors." 531 N.E.2d at 1150. In this case, the trial court did not err in considering the "nature of the weapons" in the context of sentencing.

However, we must also address Meadows' contention that all firearms are "killing devices" and that the trial court erred in separating the SKS and the AK–47, based upon their appearances, out from among other types of firearms. Meadows contends that the evidence established that these firearms were mostly used for target shooting and that there was no evidence indicating that people are frightened by their appearance.

We must agree with Meadows that all firearms may be categorized as "killing devices" because they have the capability to kill both humans and animals. To the extent that the trial court's sentencing statement could be interpreted to mean that a 9 mm or a .38 caliber handgun is not a "killing device" or does not have that capability, we disagree. Moreover, based upon the lack of any evidence in the record that people are generally frightened be-

cause of the appearance of these particular firearms, the trial court should not have relied upon it as an aggravating factor. Additionally, we see little relevance to the "frightening" appearance of a firearm in determining whether that particular circumstance may be used as an aggravating factor. While some may assume that the more "frightening" a firearm looks the more deadly it may be, such is not necessarily the case. The true concern, and what may be properly utilized as an aggravating circumstance, is the capability of a particular firearm. That said, we do not believe that the trial court was singling out the SKS and the AK–47 solely because of their appearance and the common reference to them as "assault rifles," but because of their capabilities in the hands of a serious violent felon.

The testimony of the dealer who sold Meadows the SKS revealed that the SKS was mostly used for target shooting. However, he also testified that the ammunition which is used in the SKS is similar to ammunition which is probably responsible for harvesting more animals than any other cartridge in the country. He also stated that the SKS was not sold for urban self-defense because the penetration capability of the bullet is too high as it can penetrate several layers of drywall and an innocent bystander could be hurt several apartments away. It was also stated that

the SKS could "dispatch a human at four, five hundred yards, 1500 feet." Tr. at 213. There was additional testimony which revealed that the SKS had been modified by the addition of a thirty-round magazine which increased the capabilities of the SKS and also rendered it illegal.

In comparing the firearms possessed in this crime to a 9 mm or a .38, it appears that the trial court was attempting to draw into consideration the capabilities of the SKS and the AK–47 as discussed at the trial.[16] Because these firearms were ultimately used in a crime in which their capabilities may have played a significant role in the death of Deputy Baker and the injury of the bystander, the trial court did not err in considering the nature of the weapons at sentencing.

■■ A sentence which is authorized by statute will not be revised unless it is inappropriate in light of the nature of the offense and the character of the offender. *Kien v. State*, 782 N.E.2d 398, 416 (Ind.Ct. App.2003).[17] The presumptive sentence is meant to be the starting point for any court's consideration of the appropriate sentence for the crime committed. *Hildebrandt v. State*, 770 N.E.2d 355, 361 (Ind. Ct.App.2002), *trans. denied*.[18] Courts may then deviate from the presumptive sentence based upon a balancing of the aggravating and mitigating factors which must

16. In fact, a reading of the State's argument at the sentencing hearing indicates that the State made the comparison between a .38 caliber handgun and the SKS and the AK–47. In so doing, the State noted that the SKS had been modified with a thirty-round magazine and that this was a significant increase in fire power over a .38 and that the firearms purchased by Meadows had a more lethal capability than a .38 caliber handgun.

17. "On July 19, 2002, our Supreme Court amended Appellate Rule 7(B), effective January 1, 2003. The rule is directed to the reviewing court and sets forth the standard for

that review. That review is made as of the date the decision or opinion is handed down. Accordingly, although the sentence here was imposed prior to January 1, 2003, our review has taken place as of this date and the 'inappropriate' test is therefore applied." *Kien*, 782 N.E.2d at 416 n. 12.

18. The presumptive sentence for a Class B felony is ten years, with up to an additional ten years added for aggravating circumstances and not more than four years subtracted for mitigating circumstances. Ind. Code § 35–50–2–5 (Burns Code Ed. Repl. 1998).

be considered pursuant to I.C. § 35–38–1–7.1(b) and (c), as well as the other factors left to the trial court's discretion. *Id.*

 It is the responsibility of the trial court to determine the appropriate weight to accord aggravating and mitigating factors. *Davies,* 730 N.E.2d at 741–42. Generally, a single aggravating factor may be sufficient to support an enhanced sentence. *Hatchett,* 740 N.E.2d at 929. When a trial court relies upon an improper aggravator but other valid aggravators exist, a sentence enhancement may still be upheld. *Id*

We have determined that the trial court did rely upon an improper aggravating factor in sentencing. In addition, reviewing the manner in which the trial court applied a single aggravating factor to each separate conviction, we are at a loss to discern the manner in which the trial court assigned weight to the aggravators. It is not clear if the trial court was assigning only enough weight to each aggravating factor to enhance a single conviction, or rather, if the remaining two aggravators would be sufficient to support all of the enhancements which the trial court placed upon the sentences. Because it is the responsibility of the trial court to assign weight to the aggravators, we decline to substitute our discretion for that of the trial court. Therefore, we remand to the trial court to review the sentence which Meadows received in light of this decision. Moreover, because we are remanding this case to the trial court to revisit the issue of sentencing, we do not address Meadows' contention that the sentence he received was inappropriate.

The judgment of the trial court is affirmed in all respects except as to sentencing and the cause is remanded for the trial court to review Meadows' sentence not inconsistent with this decision.

SHARPNACK, J., and KIRSCH, J., concur.