Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 22 2014, 9:31 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**VALERIE K. BOOTS**
Marion County Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ERIC P. BABBS**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

CHALLIE A. GRAY,                                )
                                                )
    Appellant-Defendant,                        )
                                                )
          vs.                                )    No. 49A02-1306-CR-534
                                                )
STATE OF INDIANA,                               )
                                                )
    Appellee-Plaintiff.                         )

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Mark D. Stoner, Judge
Cause No. 49G06-1201-MR-4425

**January 22, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BRADFORD, Judge**

**CASE SUMMARY**

Appellant-Defendant Challie A. Gray was convicted, following a jury trial, of the murder of Regina Roska. In challenging his conviction on appeal, Gray contends that the trial court abused its discretion in excluding certain evidence from trial. Gray also contends that the trial court abused its discretion in admitting certain evidence at trial. Specifically, Gray claims that the trial court erroneously excluded evidence relating to the prior bad acts of an unnamed possible third-party perpetrator as well as evidence of the potential motive of the possible unnamed third-party perpetrator. Gray also claims that the trial court erroneously admitted video of a surveillance recording offered by Appellee-Plaintiff State of Indiana. Concluding that the trial court acted within its discretion with regard to the exclusion and admission of the evidence in question, we affirm.

**FACTS AND PROCEDURAL HISTORY**

In January of 2012, Gray lived with his girlfriend, Roska, in Apartment 417 of a single-story apartment complex on Indianapolis's west side. At approximately 10:15 p.m. or 10:30 p.m. on January 18, 2012, Gray and Roska parked a white van belonging to Gray in front of Apartment 417. Neighbor Ashley Engleking heard Gray and Roska arguing with each other as they exited the van and entered Apartment 417.

Fifteen to twenty minutes later, Engleking approached Apartment 417 to deliver some fudge and two birthday cards to Roska. As Engleking approached Apartment 417, but before knocking on the door, she heard Gray say, "F*** you, fat b****, I wish you would die." A/V Rec. 5/13/13 2:44:02-2:44:18 p.m. When Roska answered the door, Engleking noticed that

2

Roska looked unusually pale. Engleking did not see anyone outside of Apartment 417 or any vehicles coming or going from the area as she returned to her apartment.

Not long after Engleking left Apartment 417, David Martin, who lived next door to Gray and Roska in Apartment 419, heard a man and a woman arguing in Apartment 417. Martin then heard a banging or thumping noise coming from Apartment 417. After hearing the banging or thumping noise, Martin opened his front door and saw Gray walking quickly away from the apartment building before turning around and walking back toward the apartment building.

Michael Carson, who lived two doors down from Gray and Roska in Apartment 413, also looked outside after hearing four knocking sounds. Although Carson did not initially see anyone outside, he saw Gray quickly walking to the white van before turning and walking back toward the apartment building a few moments later.

Carol Radloff, who also lived next door to Gray and Roska in Apartment 415, had almost fallen asleep when she heard glass breaking. Upon investigating the cause of the sound, Radloff discovered three bullet holes in the wall of her living room that was shared with Apartment 417. Radloff also discovered that the glass on a picture frame hung on a wall in her apartment had been broken by a bullet. Radloff then telephoned her caregiver, Bonnie Hart, and asked Hart to come assess the situation. Soon thereafter, Hart and Joyce Collier looked through the partially opened door of Apartment 417, saw Roska's limp arm, and requested that neighbors call 911.

When Indianapolis Metropolitan Police Officer Kenneth Kunz arrived at Apartment

417 at approximately 11:17 p.m., he found that the door was ajar. Officer Kunz saw Roska's body lying on the floor after he met resistance as he tried to open the door. Officer Kunz did not find anyone else in the apartment. Roska had been shot three times: once in the head, once in the neck, and once in the chest. Roska was subsequently transported to the hospital, where she was pronounced dead at 11:59 p.m.

During a further investigation of Apartment 417, police found a spent bullet laying in the doorway of Apartment 417; four spent casings laying in the living room, which was the room nearest the doorway; and a box of ammunition in the living room. The ammunition inside the box was stamped "CCI 9mm LUGER." Three of the four spent casings were also stamped "CCI 9mm LUGER" and the fourth spent casing was stamped "Tulamo 9mm LUGER." Police also recovered spent bullets from Radloff's apartment. It was subsequently determined that the three CCI-brand casings and the spent bullets recovered from the crime scene and Radloff's apartment had all been fired from the same firearm.[1]

Gray was apprehended a short time later coming out of a wooded area approximately one mile from Apartment 417. Without being questioned or prompted by police, Gray said something to the effect that he did not know why he did what he did. At the time Gray was apprehended, his shirt, pants, belt, socks, and shoes had blood stains or droplets of blood on them. Gray's pants had also been torn near the knee. DNA testing of the samples found on Gray's belt and sock showed that each item contained a DNA mixture, the major profile of which either matched or was consistent with Gray, and the minor profile of which either

---

[1] The firearm used in the shooting was never recovered.

4

matched or was consistent with Roska.

On January 23, 2012, the State charged Gray with murder. The trial court conducted a two-day jury trial on May 13, 2013, and May 14, 2013. During trial, Gray sought to introduce evidence of an alternative killer, an unnamed man who lived in or around the apartment complex who was known to have a propensity for mischief and criminal behavior. The trial court excluded some of Gray's proffered evidence as being hearsay as well as too speculative and remote. Following the two-day trial, the jury found Gray guilty of Roska's murder. The trial court subsequently sentenced Gray to a sixty-two-year term of imprisonment.

## DISCUSSION AND DECISION

On appeal, Gray contends that the trial court abused its discretion in excluding certain evidence and also in admitting certain evidence. Specifically, Gray claims that the trial court erroneously excluded evidence relating to the prior bad acts of an unnamed possible third-party perpetrator and evidence of the potential motive of the unnamed possible third-party perpetrator. Gray also claims that the trial court erroneously admitted video of a surveillance recording showing the outside of Gray and Roska's apartment during the timeframe relevant to Roska's murder.

> We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Iqbal v. State*, 805 N.E.2d 401, 406 (Ind. Ct. App. 2004). An abuse of discretion occurs if a trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Id.* However, the improper admission of evidence is harmless error when the conviction is supported by substantial independent evidence of guilt sufficient to satisfy the reviewing court that there is no substantial likelihood that the questioned evidence contributed to the conviction. *Hernandez v. State*, 785 N.E.2d 294,

5

300 (Ind. Ct. App. 2003), *trans. denied*.

*Ware v. State*, 816 N.E.2d 1167, 1175 (Ind. Ct. App. 2004). "To determine that the error did not contribute to the verdict, we determine whether the error was unimportant in relation to everything else the jury considered on the issue in question." *Meadows v. State*, 785 N.E.2d 1112, 1122 (Ind. Ct. App. 2003).

## I. Exclusion of Evidence

In arguing that the trial court abused its discretion in excluding evidence relating to the prior bad acts of an unnamed possible third-party perpetrator and the potential motive of the unnamed possible third-party perpetrator, Gray argues that the evidence was crucial to his theory of defense, *i.e.*, that Roska was the victim of a "robbery gone bad," and, as a result, that the trial court denied him of his constitutional right to present a defense. Gray correctly asserts that he has a constitutional right to present a defense. However, in presenting said defense, Gray must comply with the established rules of procedure and evidence that are designed to assure both fairness and reliability in the ascertainment of guilt and innocence. *See Chambers v. Mississippi*, 410 U.S. 284, 302 (1973).

### A. Prior Bad Acts of an Unnamed Possible Third-Party Perpetrator

Gray argues that the proffered evidence of alleged prior bad acts of an unnamed possible third-party perpetrator who lived in or near the apartment complex was relevant and should have been admitted at trial. Under Indiana Evidence Rule 401, "evidence is relevant when it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without

evidence.'" *McGaha v. State*, 926 N.E.2d 1050, 1053 (Ind. Ct. App. 2010) (quoting Ind. Evid. R. 401), *trans. denied*. "Evidence which tends to show that someone else committed the crime logically makes it less probable that the defendant committed the crime, and thus meets the definition of relevance in Rule 401." *Joyner v. State*, 678 N.E.2d 386, 389 (Ind. 1997). "However, under Evidence Rule 403, the evidence may be excluded if its probative value is out-weighed by unfair prejudice, confusion of the issues, or the potential to mislead the jury." *McGaha*, 926 N.E.2d at 1053. "Before evidence of a third party is admissible, the defendant must show some connection between the third party and the crime." *Id*.

In *Joyner*, the defense sought to present evidence that the alleged third-party actor was having an affair with the victim, worked at the same place as the victim, had engaged in sexual relations with the victim the night before her disappearance, had an argument with the victim the day she was last seen alive, and came to work late the day after her disappearance, falsifying his tardiness on his time sheet. 678 N.E.2d at 389. Other evidence admitted at trial, *i.e.* evidence that a hair found inside the plastic bag covering the victim's head excluded the defendant as the donor of the hair but indicated that there was a ninety-eight to ninety-nine percent probability match with the alleged third-party actor, was consistent with the proffered evidence. *Id*. The Indiana Supreme Court held that, under those circumstances, it was error to prevent the defense from offering the proposed evidence connecting the alleged third-party actor to the victim. *Id*. at 390.

Here, unlike in *Joyner*, the record was devoid of any evidence connecting the unnamed possible third-party perpetrator to the victim. Gray sought to admit evidence that

7

this unnamed individual had, on occasion, thrown rocks at the windows of one of the residents of the apartment complex, was said to have stolen an air conditioner, and was said to have a drug problem. No evidence was admitted into the record or proffered by Gray, however, indicating that Roska knew this unnamed possible third-party perpetrator, that Roska had had any prior interaction with the unnamed possible third-party perpetrator, or that there was any connection whatsoever between Roska and this unnamed individual. As such, we conclude that the trial court did not abuse its discretion in excluding the proffered evidence. *See Lashbrook v. State*, 762 N.E.2d 756, 758 (Ind. 2002) (providing that the trial court acted within its discretion in excluding evidence of statements made by a third party where, in stark contrast to *Joyner*, there was no material evidence connecting the third party to the victim); *Pope v. State*, 737 N.E.2d 374, 379 (Ind. 2000) (providing that the trial court acted within its discretion in excluding evidence that a third party possessed bullets similar to bullets found at the crime scene over a week before the shooting because there was simply no link between the bullets recovered from the crime scene and the bullets allegedly possessed by the third party).

In addition, the trial court acted within its discretion in excluding the evidence of the prior bad acts of the unnamed possible third-party perpetrator because the proffered evidence was nothing more than propensity evidence that was offered to prove that the unnamed possible perpetrator had a propensity to engage in mischief and criminal behavior, and

8

therefore was disallowed under Indiana Evidence Rule 404(b).[2]  *See Camm v. State*, 908

N.E.2d 215, 231 (Ind. 2009) (providing that the proffered evidence of a third party's sexual

compulsion for feet and shoes was properly excluded under the Rules of Evidence because

the proffered evidence was intended to lead the jury to make the forbidden inference that the

third party acted in conformity with this character trait); *Hauk v. State*, 729 N.E.2d 994, 1001

(Ind. 2000) (providing that the trial court's decision to exclude evidence suggesting that a

third party acted in accordance with a character trait was well within the court's discretion).

### B.  Motive of the Unnamed Third Party Perpetrator

During trial, Gray sought to present the theory that Roska was killed by an unnamed

third-party perpetrator during a "robbery gone bad."  In support of this defense, Gray sought

to introduce evidence that there was a general belief in the neighborhood that Gray had

recently received a lump sum of money.  Gray argues that the proffered evidence relating to

the general belief in the neighborhood that he had recently received a lump sum of money

was relevant to show that some unnamed third party had motive to break into Gray and

Roska's apartment.  Again, in the context of third-party motive evidence, before evidence

relating to a third party is admissible, the defendant must show some connection between the

third party and the crime.  *See Pelley v. State*, 901 N.E.2d 494, 505 (Ind. 2009*), declined to

follow on other grounds by Austin v. State*, 997 N.E.2d 1027 (Ind. 2013); *McGaha*, 926

N.E.2d at 1053.  Gray has failed to do so.

---

[2]  Indiana Evidence Rule 404(b) provides that "evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."

In *Pelley*, the defendant sought to introduce evidence that a third-party allegedly associated with the victim's prior life in Florida had motive to kill the victim. 901 N.E.2d at 505. The defendant, however, did not show that the witnesses called at trial were competent to testify about the victim's life in Florida or present any evidence connecting the events that were alleged to have occurred in Florida to the murder of the victim. *Id.* at 505-06. Upon review, the Indiana Supreme Court found that absent a more direct connection, the trial court did not abuse its discretion in excluding the proffered evidence of an alleged third-party motive as too speculative. *Id.* at 506.

Likewise, in *McGaha*, the defendant sought to introduce evidence that a third-party, *i.e.*, the victim's marijuana dealer, had motive to kill the victim. 926 N.E.2d at 1054. The proffered evidence, however, did not indicate that any of the witnesses had first-hand knowledge of statements or conduct on the part of the alleged marijuana dealer. *Id.* At most, one witness had knowledge of a rumor. *Id.* Upon review, this court determined that because the defendant was unable to offer any evidence connecting the alleged marijuana dealer to the victim's murder, the trial court acted within its discretion in excluding the proffered evidence. *Id.* at 1055.

Here, Gray sought to introduce evidence that a third-party could have had a motive to rob him and Roska because there was a general belief in the neighborhood that he had recently received a lump sum of money. The trial court allowed Gray to question Collier and Engleking about whether Gray had given either of them money and about whether they had seen Gray give money to any other individual. The trial court also allowed Collier to testify

10

to her belief regarding Gray's financial situation in light of the money he gave her. The trial court, however, excluded evidence relating to rumors or claims which Collier and Engleking had heard from others about Gray.

Upon review, we observe that the record is devoid of any evidence indicating that a robbery occurred. Gray presented no evidence suggesting that anything was missing from Apartment 417. Also, multiple witnesses testified that they did not see any other individual in or around Apartment 417 before, during, or after Roska's murder. As such, any evidence relating to rumors concerning Gray's financial status as a potential motive for a "robbery gone bad" that resulted in Roska's death was too speculative to be relevant. Accordingly, we conclude that the trial court acted within its discretion in excluding the proffered evidence because Gray has failed to establish a connection between any unnamed possible third-party perpetrator and Roska's murder. *See Pelley*, 901 N.E.2d at 505; *McGaha*, 926 N.E.2d at 1053.

## II. Admission of Evidence

Gray also argues that the trial court abused its discretion in admitting a surveillance video recording of the area outside Apartment 417 from the night in question. Specifically, Gray argues that the video should not have been admitted because the quality of the video was low, and as a result, no relevant evidence could be gleaned from the video. We disagree.

While we note that the quality of the surveillance video was indeed poor, upon review, we were able to observe what appeared to be a white van approach and park outside Apartment 417 at approximately 10:34 p.m. Shortly after 11:00 p.m., we were also able to

11

observe what appeared to be a man exit Apartment 417 and approach the white van before turning and walking back toward the apartment building. While the video quality was such that we were unable to definitively identify the man in the video as Gray, these images were consistent with witness testimony regarding Gray's actions just prior to and after the time when Roska appears to have been shot. As such, we conclude that the surveillance video was relevant to the State's case as it appeared to bolster the testimony of the State's witnesses. The trial court, therefore, acted within its discretion in admitting the surveillance video into evidence at trial.

Furthermore, even if the video quality was so poor as to make it impossible to glean relevant evidence from the video, any potential error in admitting the video was, at most, harmless.

> No error in the admission of evidence is grounds for setting aside a conviction unless such erroneous admission appears inconsistent with substantial justice or affects the substantial rights of the parties. The improper admission of evidence is harmless error when the conviction is supported by such substantial independent evidence of guilt as to satisfy the reviewing court that there is no substantial likelihood that the questioned evidence contributed to the conviction. To determine whether the erroneous admission of irrelevant and prejudicial evidence of extrinsic offenses is harmless, we judge whether the jury's verdict was substantially swayed. If the error had substantial influence, or if one is left in grave doubt, the conviction cannot stand.

*Lafayette v. State*, 917 N.E.2d 660, 666-67 (Ind. 2009) (internal citations and quotation omitted).

Upon review of the unchallenged evidence, we cannot say that the allegedly erroneously admitted surveillance video had a substantial influence on the jury's verdict.

12

Engleking testified that she heard Gray and Roska arguing as they entered Apartment 417 together approximately thirty minutes before Roska was shot. Multiple other witnesses testified that they heard a man and a woman arguing just prior to the shooting. Shortly after the shooting, multiple witnesses saw Gray walk from the area of Apartment 417. Gray was subsequently apprehended about one mile from Apartment 417. When apprehended by police, Gray had traces of Roska's blood on his clothing. In addition, while being transported to the police station, Gray volunteered a comment, without any prompting by police, to the effect that he did not know why he did what he did. In light of the evidence of Gray's guilt, cannot say that there was a substantial likelihood that the allegedly unclear images depicted on the surveillance video had a substantial influence on the jury's verdict. As such, the admission of the surveillance video was, at most, harmless. *Id*. at 667.

## CONCLUSION

In sum, the trial court acted within its discretion in excluding the proffered evidence relating to the alleged prior bad acts of an unnamed possible third-party perpetrator as well as the possible motive of said unnamed third party. The trial court also acted within its discretion in admitting the surveillance video at trial.

The judgment of the trial court is affirmed.

KIRSCH, J. and MAY, J., concur.

13