ATTORNEY FOR APPELLANT
Stacy R. Uliana
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Gary Damon Secrest
Jodi Kathryn Stein
Deputy Attorney Generals
Indianapolis, Indiana



FILED
Feb 19 2009, 9:24 am
CLERK
of the supreme court,
court of appeals and
tax court

# In the
# Indiana Supreme Court

No. 71S05-0808-CR-446

ROBERT JEFFREY PELLEY,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

Appeal from the St. Joseph Superior Court, No. 71D08-0208-MR-00016
The Honorable Roland W. Chamblee, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 71A05-0612-CR-726

**February 19, 2009**

**Boehm, Justice.**

Robert Jeffrey Pelley appeals his convictions for the murders of his father, stepmother, and two stepsisters. We affirm Pelley's convictions. We hold that the Criminal Rule 4(C) period does not include the time for the State's interlocutory appeal when trial court proceedings have been stayed. We also hold that the evidence was sufficient to support the convictions, and the trial court did not err in its challenged evidentiary rulings or in denying Pelley's motion for a special prosecutor.

**Facts and Procedural History**

In 2007, a jury found Pelley[1] guilty of the 1989 murders of his father, stepmother, and two stepsisters. The convictions were based on circumstantial evidence supporting the State's theory that Pelley, who had been grounded from events connected to his high school senior prom, killed his father in order to attend those activities with his girlfriend, and killed his stepmother and stepsisters because they were present when he killed his father. Pelley was sentenced to consecutive forty-year sentences, for an aggregate sentence of one hundred sixty years. Pelley appealed his convictions, raising four claimed errors:

I. Denial of his motion for discharge under Criminal Rule 4(C) because he was not tried within one year after his arrest due to the State's interlocutory appeal;

II. Insufficient evidence to support the convictions;

III. Admission of certain hearsay statements and exclusion of evidence regarding a third-party motive and the prosecutor's delay in bringing charges; and

IV. Denial of Pelley's petition for a special prosecutor.

The Court of Appeals reversed Pelley's convictions on the first issue and therefore did not address the remaining three. Pelley v. State, 883 N.E.2d 874, 876 (Ind. Ct. App. 2008). We granted transfer and affirm the trial court on all four issues. We set out the facts and procedural steps relevant to each issue in the following sections.

## I. Interlocutory Appeals and Criminal Rule 4(C)

Pelley argues that Indiana Rule of Criminal Procedure 4(C) entitles him to discharge. That Rule provides that a defendant may not be held to answer a criminal charge for greater than one year unless the delay is caused by the defendant, emergency, or court congestion.[2] In Pel-

---

[1] The defendant's formal name is Robert Jeffrey Pelley, and his father's is Robert L. Pelley. Throughout trial, the parties referred to the defendant as "Jeff" and his father as "Bob." We will follow this convention, and also refer to Jeff as "Pelley." A number of witnesses adopted new last names between the murders and the trial. We refer to all witnesses by the names used in 1989.

[2] The full text of Rule 4(C) is:

No person shall be held on recognizance or otherwise to answer a criminal charge for a period in aggregate embracing more than one year from the date the criminal charge against such defendant is filed, or from the date of his arrest on such charge, whichever is later; except where a continuance was had on his motion, or the delay was caused by his

ley's case, the Rule 4(C) period was triggered by his August 10, 2002 arrest, and the period was extended slightly by Pelley's agreement to a continuance.

Trial did not occur within the 4(C) period because of a discovery dispute and the resulting interlocutory appeal. On August 22, 2002, the State issued a subpoena duces tecum to the Family & Children's Center, which provided counseling to the Pelley family in 1988 and 1989. The subpoena directed production of the family's counseling records but did not provide a specific response date. The Center moved to quash the subpoena on February 26, 2003 on the ground that the counseling records were privileged.

The State and the Center submitted memoranda and lengthy arguments at the hearing on the motion to quash. Pelley submitted no written materials but responded orally and was substantively aligned with the Center, except that Pelley alone objected to the trial court's in camera examination of the counseling records. Ultimately, the trial court reviewed the records in camera and granted the Center's motion to quash. The trial court noted that none of the records contained information related "directly to the fact or immediate circumstances" of the murders even under an expansive interpretation of that phrase.

At the State's request, the trial court certified its order for interlocutory appeal, finding that the order involved a substantial question of law and that the State would have an inadequate remedy without the interlocutory appeal. The Court of Appeals accepted the appeal and stayed proceedings in the trial court pending resolution of the appeal. The issue was ultimately resolved by this Court's opinion of June 14, 2005, holding in part that the trial court erred in quashing the subpoena. State v. Pelley, 828 N.E.2d 915, 923 (Ind. 2005). Pelley did not participate in the appeal.

---

act, or where there was not sufficient time to try him during such period because of congestion of the court calendar; provided, however, that in the last-mentioned circumstance, the prosecuting attorney shall file a timely motion for continuance as under subdivision (A) of this rule. Provided further, that a trial court may take note of congestion or an emergency without the necessity of a motion, and upon so finding may order a continuance. Any continuance granted due to a congested calendar or emergency shall be reduced to an order, which order shall also set the case for trial within a reasonable time. Any defendant so held shall, on motion, be discharged.

The case was remanded to the trial court, and on October 28, 2005, trial was set for July 10, 2006. Pelley did not object to this trial date. On January 4, 2006, Pelley filed a motion to dismiss under Rule 4(C), arguing that the July 10, 2006 trial date was beyond the one-year period provided by Rule 4(C), and Rule 4(C) does not contain an exception for interlocutory appeals. The State responded that the time for the interlocutory appeal should be charged to the defense or court congestion, and the stay prevented the State from acting during the appeal. The trial court denied Pelley's motion, finding that although Pelley did not cause the delays incident to the interlocutory appeal, the Criminal Rule 4(C) period was tolled during the appeal. The trial court also noted that the stay issued by the Court of Appeals "preclud[ed] the trial court from exercising jurisdiction," and assumed that "the Appellate Court was aware that such stay would, interfere with observance of the Defendant's C.R. 4(C) Rights." Pelley requested, and the trial court denied, an interlocutory appeal of this order. Pelley then brought an original action in this Court for writ of prohibition and writ of mandamus. We denied his petition without an opinion.[3]

Pelley's trial began July 12, 2006. The State did not seek to introduce the counseling records, or anything derived from the records. The jury found Pelley guilty of all four murders. Pelley appealed his convictions and argues that he was entitled to discharge under Rule 4(C).

A majority of the Court of Appeals reversed Pelley's convictions, holding that discharge was required because Rule 4(C) contains no exception for interlocutory appeals, and Pelley was not responsible for the delay. Pelley v. State, 883 N.E.2d 874, 885 (Ind. Ct. App. 2008). Judge Friedlander dissented, reasoning that the delay for the interlocutory appeal was excluded from the 4(C) period as a form of emergency or court congestion. Id. at 887–88. The only question is whether Rule 4(C) excludes the time for the State's interlocutory appeal from its one-year limitation. This issue is one of law which we review de novo.

A defendant extends the one-year period by seeking or acquiescing in delay resulting in a later trial date. Vermillion v. State, 719 N.E.2d 1201, 1204 (Ind. 1999). A defendant waives his

---

[3] The State contends that our denial of Pelley's original action precludes Pelley from invoking Rule 4(C) on appeal. As the Court of Appeals correctly determined, our denial of Pelley's petition for writ of mandamus was not a judgment on the merits of his 4(C) claim, but a judgment that he was not entitled to relief by extraordinary writ. Pelley v. State, 883 N.E.2d 874, 880 (Ind. Ct. App. 2008) (citing Vermillion v. State, 719 N.E.2d 1201, 1204 n.5 (Ind. 1999)).

4

right to be brought to trial within the period by failing to raise a timely objection if, during the period, the trial court schedules trial beyond the limit. Id. However, a defendant has no duty to object to the setting of a belated trial date if the setting occurs after the year has expired. Morrison v. State, 555 N.E.2d 458, 463 (Ind. 1990), overruled on other grounds by Cook v. State, 810 N.E.2d 1064, 1067 (Ind. 2004). As a result of these rules, if the time for interlocutory appeal is excluded from the Rule 4(C) period, then Pelley waived his claim by failing to object to the July 10, 2006 trial setting because the one-year limitation had not expired when that trial date was set. On the other hand, if the time for interlocutory appeal is included, the one-year limitation had long passed when the trial date was set, and Pelley's discharge was required notwithstanding his failure to object.

This Court has previously examined the effect of the State's interlocutory appeal on the period in which a defendant must be brought to trial. In Martin v. State, 245 Ind. 224, 228, 194 N.E.2d 721, 723 (1963), the State filed a mandamus proceeding following the trial court's denial of the State's motion for a change of judge. During the course of the mandamus action, the statutory time limit—then framed in terms of court[4]—expired. The defendant moved for discharge, arguing that the time for the State's mandamus proceeding could not be attributed to him. We upheld the trial court's denial of the discharge motion, in part because the defendant was the real party in interest in the change of judge, and his attorneys represented the respondent judge in the original action. Id. at 229, 194 N.E.2d at 724. We also stated that the three-term statute did not apply "where the delay was caused by proceedings in this court." We explained that neither the prosecutor nor the trial judge could control the time required for an appeal, and most appeals would trigger a dismissal, a result that the legislature could not have intended. Id. Following the

---

[4] Criminal Rule 4(C)'s predecessor was a statute providing in part that "[n]o person shall be held by recognizance to answer an indictment or affidavit, without trial, for a period embracing more than three terms of court. . . ." 1905 Indiana Acts, chap. 169, § 220, at 632 (later codified at Ind. Code § 35-1-27-1). This Court's 1965 adoption of Rule 1-4D, effective in 1970 as Criminal Rule 4, superseded the statutory limitation. The original Rule 4(C) provided in part

> No person shall be held by recognizance to answer an indictment or affidavit, without trial, for a period embracing more than one year continuously from the date on which a recognizance was first taken therein.

The three-term limit translates into the current one-year limit. Prior to 1967, Indiana courts observed May, September, and November terms. This distinction was abolished by statute which extended the term to the calendar year. Ind. Code § 33-23-2-1 (2004).

adoption of our criminal rules, we quoted <u>Martin</u> with approval in <u>State ex rel. Cox v. Super. Ct. of Madison County</u>, 445 N.E.2d 1367, 1368 (Ind. 1983), in holding that Rule 4(B)'s early trial requirement was tolled pending the State's interlocutory appeal of the trial court's ruling on defendant's motion in limine.

We believe that <u>Martin</u>'s rationale controls here. When trial court proceedings have been stayed pending resolution of the State's interlocutory appeal, the trial court loses jurisdiction to try the defendant and has no ability to speed the appellate process. As a practical matter, applying the Criminal Rule 4(C) one-year requirement to interlocutory appeals would render an appeal by the State impossible because it would in all likelihood trigger a mandatory discharge of the defendant. Accordingly, we conclude that Rule 4(C)'s one-year limitation does not include the time during which trial proceedings have been stayed pending interlocutory appeal.

We note that the time for an interlocutory appeal is excluded from Rule 4(C)'s limitation only when trial court proceedings have been stayed. The trial court and Court of Appeals have discretion to deny a motion to stay if it appears that the State is seeking a stay for improper purposes, or if the appeal presents issues that are not critical to the case. Indeed the latter seems to have been the case here, as the materials produced were never admitted in evidence. Additionally, although Appellate Rule 21(A) provides generally for expedited consideration of interlocutory appeals, in the future the State should alert the appellate court when it pursues an interlocutory appeal not chargeable to the defendant so the appellate court can be sensitive to the defendant's interest in avoiding delay.

## II. Sufficiency of the Evidence

Pelley contends that there is insufficient evidence to support his murder convictions. When reviewing a claim of insufficient evidence, we do not reweigh evidence or judge the credibility of witnesses. Rather, if there is probative evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt, we affirm the conviction. <u>O'Connell v. State</u>, 742 N.E.2d 943, 949 (Ind. 2001). Circumstantial evidence is sufficient for a conviction if inferences may reasonably be drawn that allowed the jury to find the defendant guilty beyond a reasonable doubt. <u>Pierce v. State</u>, 761 N.E.2d 821, 826 (Ind. 2002).

The State's evidence against Pelley is entirely circumstantial. The State's evidence of motive was inconsistent statements given by Pelley and his father leading up to the prom about what activities Pelley could attend. The State's evidence identifying Pelley as the murderer consisted of a timeline placing Pelley at the scene just before the murders, the appearance that the murders were an "inside job," Pelley's experience with weapons, the absence of the father's shotgun following the murders, inconsistent statements made by Pelley about his activities on the night of the murders, and statements made by Pelley suggesting but not directly supporting his guilt.

The facts supporting the convictions follow. In the spring of 1989, seventeen-year-old Jeff Pelley lived with his father, Bob, his sister, Jacque, his stepmother, Dawn, and her children, Jessica, Janel, and Jolene. Jeff and Jacque's mother had died of cancer in 1985, and Bob and Dawn had married approximately nine months later. In 1986, Bob had become minister of the Olive Branch Church on Osborne Road in Lakeville, approximately twelve miles from South Bend, and the family moved into the parsonage next door. Bob and Jeff were frequently in conflict, often relating to Jeff's resentment of his stepmother and his feeling that she was replacing his deceased mother.

In April 1989, Bob grounded Jeff and prohibited him from driving his Ford Mustang and attending senior prom activities, which included dinner, a dance, an afterprom, and a trip to the Great America amusement park in suburban Chicago. The insurance on Jeff's Mustang was suspended on April 12, 1989, and the policy change noted that Jeff "is grounded from using this car and all vehicles in household." As the prom approached, Jeff eventually received permission to attend the dance on the condition that Bob would drive Jeff and his girlfriend, Darla Emmons. Jeff and Darla were not pleased with this arrangement.

A few days before prom weekend, Jeff told Darla that he was working on changing Bob's mind to permit him to attend the dinner before the dance. On the Friday night before the prom, Jeff told Darla that he had received permission to attend all prom activities, but that Darla should not mention this to anyone because it was a sore subject. However, according to five witnesses, Bob told them in the twenty-four hours before the prom that Jeff was permitted to attend only the

7

dance, and Bob would drive Jeff and Darla.  Bob also mentioned that he had removed a part from Jeff's car to prevent Jeff from driving.

On the day of the prom, Saturday, April 29, 1989, Jeff worked the early morning shift at McDonald's, washed his car, and watched a baseball game on television.  By late afternoon, Bob, Dawn, Jeff, Janel, and Jolene were all at the parsonage, and Jessica and Jacque were visiting friends for the weekend.  Around 4:30 or 4:45, Kim Oldenburg, a family friend who had dated Jeff, stopped by with her mother and prom date to show the Pelleys her dress.  Kim felt there was tension at the house during her visit.  Kim noticed that Jeff was quiet and was wearing a pink and blue shirt and blue jeans.

Matt Miller, Jeff's friend from school, stopped by around 4:40 or 4:45.  Matt left after a few minutes when he realized that he had forgotten his date's corsage at home.  Kim, her date, and her mother left shortly before 5:00.  After picking up the corsage, Matt passed back by the Pelley residence around 5:15 and saw Jeff's car in the driveway.

Around 5:20, Jeff, now wearing a black shirt and jeans, arrived at a local Amoco station driving his Mustang.  He entered the station and called Darla to let her know he was running late.  He also asked the attendant for a piece of cardboard and a screwdriver to fix his car, which he said was idling too high.  After receiving some help with his car from another Amoco employee, Jeff left the station.

Around 5:30, Jeff met Darla and another couple at a friend's home.  Jeff quickly changed into his tuxedo and posed for some pictures.  Both couples left for dinner.

The first indication that the Pelleys had been murdered came around 5:30, when Bob and Dawn failed to make an expected arrival at Crystal Easterday's home to see her prom dress.  After waiting about fifteen minutes, Crystal and her date decided to stop by the Pelleys' on their way to dinner.  When Crystal arrived at the Pelley home, the Pelleys' station wagons, but not Jeff's Mustang, were in the driveway, and all the doors were locked and the curtains closed.  This surprised her because the Pelleys normally kept their doors and curtains open during the day when their cars were in the driveway.

8

Others noticed the lack of movement at the Pelley home. Around 6:00, one of the Pelleys' neighbors was mowing his lawn and noticed that the Pelleys' lights were off and that none of the girls were playing outside, which he thought was unusual. Around 6:30 or 7:00, a member left the church and noticed that there was no movement at the Pelley house.

Jeff and Darla arrived at dinner in South Bend around 6:40. After dinner, Jeff and Darla went to the dance. Jeff saw Crystal at the dance and asked whether his parents had stopped by her home. She told him they had not, but that she had stopped at the Pelley home and found it locked.

After the dance, Jeff changed out of his tuxedo at a friend's house and went to the after-prom party at a local bowling alley. At the bowling alley, Jeff asked Kim Oldenburg if he could join the slumber party at her house that night. Kim agreed, and Jeff and Darla spent the night at Kim's house with several other friends.

Around 7:00 a.m. on Sunday, April 30, Jeff and Darla left Kim's to get Darla's car and some money. While Darla was retrieving money from her house, Jeff spoke with Darla's mother, who said she was surprised that he was going to Great America. Jeff responded that he had a "two-day pass from Pelley prison." Jeff and Darla returned to Kim's house, where a group proceeded to Great America. At Great America, Jeff became quiet and told Darla that he "had a feeling that something was wrong" and "felt like something wasn't right inside."

Meanwhile, back in Lakeville, Harold Saunders, the Pelleys' next door neighbor, called the Pelleys around 7:00 a.m. to ask if they would let his dog out that day. The Pelleys did not answer their phone, and their curtains were closed. Harold and his wife had noticed that the night before, the Pelleys' basement light was still on at 9:15 and around midnight. They thought this was strange because the girls slept downstairs and normally went to bed early. They also noticed that the Pelleys' dog was outside on its chain, instead of in its kennel where it normally stayed when the Pelleys' curtains were closed.

Just before 9:30 a.m. on Sunday, members of Bob Pelley's congregation assembled for the church service. When Bob and the family did not arrive at church, members of the church's

9

board of trustees went to the parsonage and found the doors locked and the curtains closed. After finding a spare key, they entered the home.

The trustees found Bob Pelley's body in the upstairs hallway. He had been shot twice with deer slugs from a 20-gauge shotgun, once in the chest and once in the neck. His feet were pointed toward the end of the hallway leading to Jeff's bedroom and the master bedroom, and he was dressed in everyday clothes rather than pajamas or church clothes. The trustees called an ambulance. After the paramedics arrived, they found the bodies of Dawn, Janel, and Jolene huddled together in the basement, also dressed in everyday clothes. Each had been shot once from a distance of a few feet with deer slugs from a 20-gauge shotgun. Dawn had been shot in the temple, Janel in the forehead, and Jolene just below her right eye.

Police later learned that Bob owned a 20-gauge Mossberg 500 pump-action, single-barrel shotgun with interchangeable rib and slug barrels. The shotgun held five or six rounds and was typically stored in the master bedroom gun rack. Jessica saw the shotgun in the gun rack on Friday afternoon before she left, but it was not in the home after the murders, and was never found.

After investigating the crime scene, police found no evidence of burglary or forced entry. Inside the washing machine was a small load consisting of a pink and blue shirt, blue jeans, and socks that had been through a wash cycle. A luminol test of the washing machine cylinder was inconclusive, indicating either a reaction with blood or with the phosphates found in laundry detergents used in 1989. An empty gun case was found in the basement behind some sleeping bags. No shell casings were found.

Jessica told police that Jeff had gone to Great America, and Lakeville police contacted Illinois authorities, who found Jeff and Darla, told them of the murders, and held them until Lakeville police arrived and returned them to the Lakeville police station. On the way home from Great America, Jeff spontaneously told Darla that he "didn't do it," and asked whether she believed him.

Around 4:45 a.m. on Monday, May 1, police conducted a videotaped interview of Jeff in the presence of his maternal grandparents who had arrived from their home in Kentucky. Jeff said he left his home at 4:45 or 4:50 p.m. on Saturday and stopped at a Casey's gas station be-

10

cause his car was idling too fast. He made the repair with some cardboard from his car, using his key as a screwdriver, and proceeded to get Darla. At 7:00 p.m. on May 1, Jeff gave a second, unrecorded statement. Jeff again gave his version of the events, stating that he stopped at the Casey's gas station because of car trouble. By this time, the police had learned from Darla that Jeff had called her from an Amoco station. When questioned about the discrepancy, Jeff became nervous and upset. He said that he had stopped at Casey's, but had also stopped at an Amoco station because it had tools. When questioned again, he said that he stopped at Casey's to buy a pop and proceeded to the Amoco. The detective told Jeff that he did not accept this story because pop was available at both stations. The detective then told Jeff that he believed Jeff was involved in the murders, and the car trouble was part of a way to account for a time gap. Jeff slumped down in his chair, lowered his head, covered his eyes, and asked whether he could see Darla that night, whether he would go to jail that night, and whether he would get the electric chair. Jeff also asked "if there were some things that led up to what happened, would it make a difference with what happened to him."

The State presented sufficient evidence from which the jury could conclude beyond a reasonable doubt that Jeff committed the four murders: evidence of motive, access to a weapon of the type used, and presence at the site were all established. Alternate explanations seem implausible. The home was locked, suggesting a person with a key had been at the scene, and Pelley's account of his activities at the time was inconsistent and, on the videotape, sometimes flustered.

Pelley argues that his convictions cannot stand because the State's theory of the crimes is "inconsistent with the laws of nature and human experience." Pelley contends that a teenager, within twenty minutes, could not kill four of his family members, put his clothes in the washing machine, pick up the shotgun shells, take a shower, get dressed, draw the blinds, lock the doors, fix his car, and dispose of the gun and shells. Although the time window is narrow, we do not believe it is inconsistent with Pelley's guilt. Pelley was described at trial as a "very intelligent, young man," and his statements throughout the week that he would be able to attend all prom activities suggest that the murders were premeditated and planned. The jury could reasonably conclude that Pelley performed these necessary actions within the available time.

Pelley also points to inconsistencies in the accounts given by police of the length and content of the second police interview and who was present. He also cites inconsistencies between Jessica and Jacque regarding the presence of the shotgun in the master bedroom on Friday evening. Pelley also points out that despite extensive police effort, no murder weapon has been located, and he had no visible bruising from a shotgun in the days following the murder. However, none of these is conclusive of innocence. It is the jury's role to weigh these factors, and the jury found Pelley guilty beyond a reasonable doubt.

## III. Evidentiary Rulings

Pelley claims that the trial court made three erroneous evidentiary rulings: (1) admitting hearsay statements regarding which prom activities he was permitted to attend, (2) excluding testimony showing a third-party motive, and (3) excluding testimony explaining the State's delay in bringing charges.

### A. *Hearsay Regarding Prom Activities*

Eight witnesses testified to statements made by Bob Pelley regarding restrictions on Jeff Pelley's attendance of prom activities. The State argues that these statements were admissible to show Bob's intent to act in a particular way. Pelley contends that the state of mind exception to the hearsay rule applies for victims only when the defendant has placed the victim's state of mind at issue.

Hearsay is an out of court statement offered to prove the truth of the matter asserted and is inadmissible unless it falls under an exception. Ind. Evidence Rule 801(c), 802. One exception is for a "statement of the declarant's then existing state of mind . . . (such as intent, plan, motive, design, mental feeling, pain and bodily health) . . . ." Ind. Evid. R. 803(3).[5] Bob Pelley's statements show his intent to act in a particular way—to restrict Jeff's attendance at prom

---

[5] Although Bob was a victim in this case, the exception is not limited to victims, and it is not necessary that the defendant raise this issue. Rather, the rule permits statements of any person to show his or her intent, and the issue is frequently whether the person's state of mind is relevant. This issue often arises in the context of deceased victims' statements, e.g., Pierce v. State, 705 N.E.2d 173, 176 (Ind. 1998); Ross v. State, 676 N.E.2d 339, 344 (Ind. 1996); Taylor v. State, 659 N.E.2d 535, 543 (Ind. 1995), but is not limited to that context. For that reason it is sometimes described in terms of "the victim's" state of mind, and Pelley frames his argument in those terms.

12

activities and drive Jeff and his date to the prom. These statements are relevant to Jeff's motive for committing the murders and are therefore admissible under the hearsay exception for then-existing state of mind.

B.  *Exclusion of Testimony Regarding Third-Party Motive*

Pelley argues that the trial court erred in excluding evidence that a third party had a motive for the murders. Pelley asserts that the exclusion violated his Sixth Amendment right to present a complete defense. Pelley also contends that the third-party motive evidence shows that the police investigation failed to follow all possible leads, and therefore the State did not prove his guilt beyond a reasonable doubt.

Bob had apparently worked at a bank in Florida before the Pelleys moved to Indiana. On cross-examination of the lead detective in this case, Pelley sought to ask the detective about statements made by Pelley and his sister, Jacque, concerning events when Bob was at the bank. The State objected, and Pelley made an offer to prove that in April 1990, Pelley told the detective that Bob used to work for a Florida bank, and that Bob may have been killed because someone found out about money laundering at the bank. Pelley also offered to prove that in 2002 Jacque told an investigator that (1) before the family moved to Indiana, a million dollars in cash was missing from the bank, and Bob was called in to work in the middle of the night; (2) Bob was responsible for finding the missing money and was in charge of the computers at the bank; (3) after this incident, the family suddenly moved to Indiana; and (4) the DEA closed the bank in March 1990. Pelley also offered a report made to investigators in August 2002 that a resident on the Pelley's street said that another person who also lived on the street told him he had seen a white limousine with Florida license plates in the area of the Pelley home on the day of the prom in 1989. The trial court determined that this evidence was "too attenuated because it leaves utter speculation" and sustained the State's objection. Later during the trial, Pelley called Jacque as a witness and wanted to ask her about Florida. The State objected that Jacque's testimony would be hearsay, and that she was only ten or eleven years old when she lived in Florida. Again the trial court sustained the State's objection. Pelley did not make an offer of proof regarding Jacque's proposed testimony.

13

Evidence of a third-party motive tends makes it less probable that the defendant committed the crime, and is therefore relevant under Rule of Evidence 401. Joyner v. State, 678 N.E.2d 386, 389 (Ind. 1997). However, this evidence may be excluded if its probative value is outweighed by unfair prejudice, confusion of the issues, or the potential to mislead the jury. Ind. Evid. R. 403. In the context of third-party motive evidence, these rules are grounded in the widely-accepted principle that before evidence of a third party is admissible, the defendant must show some connection between the third party and the crime. See Holmes v. South Carolina, 547 U.S. 319, 327 & n.* (2006) (listing jurisdictions and quoting 41 C.J.S., Homicide § 216, at 56–58 (1991) ("Evidence tending to show the commission by another person of the crime charged may be introduced by accused when it is inconsistent with, and raises a reasonable doubt of, his own guilt; but frequently matters offered in evidence for this purpose are so remote and lack such connection with the crime that they are excluded.")).

Our cases reflect this principle. In Joyner we reversed the trial court's exclusion of evidence that a third-party committed the murder. 678 N.E.2d at 389–90. The defendant wished to present evidence that a third party was having an affair with the victim, worked with the victim, had engaged in sexual relations with the victim the day before her disappearance, had argued with the victim the day of her disappearance, and had been tardy to work and falsified his time card the day after the disappearance. Id. The defendant had already presented expert testimony that a hair sample found inside the plastic bag covering the victim's head excluded the victim and the defendant, but was a ninety-eight to ninety-nine percent probability match to the third party. Id. Under these circumstances, we determined that the defendant had sufficiently connected the third party to the crime, and the excluded evidence could have also established motive and opportunity. Id. at 390. We remanded for a new trial. Id.

In contrast, we rejected a similar claim in Lashbrook v. State, 762 N.E.2d 756, 757 (Ind. 2002), where the defendant wished to present evidence that a third party had said the victim "was gonna die." We held that "[i]n stark contrast to Joyner, the defendant presents no material evidence that [the third party] was connected to the crime. The phrase allegedly uttered by [the third party] . . . does not tend to show that [he] committed the murder." Id. at 758.

14

Pelley's case falls between <u>Joyner</u> and <u>Lashbrook</u>, but is much closer to <u>Lashbrook</u>. Pelley suggested that someone from Bob's past in Florida had the motive to commit the murders. Pelley's offer of proof was hearsay statements of Jeff and Jacque that Bob had worked at a Florida bank connected with money laundering, and hearsay within hearsay that a limousine with Florida license plates was seen near the Pelley home on the day of the murders. However, Pelley did not show how he or Jacque was competent to testify regarding the Florida situation. Equally important, he failed to present any evidence connecting the bank or the limousine to the murders. Absent a more direct connection, the trial court did not abuse its discretion in excluding this evidence as too speculative.

C. *Exclusion of Testimony Regarding the State's Delay in Charging Pelley*

During rebuttal, the State called Jack Krisor, deputy prosecuting attorney at the time of the Pelley murders, to clarify who was present during Pelley's second interview by police in 1989. Pelley wanted to ask about Krisor's previously-expressed opinion that there was "not enough information to charge this case." The trial court limited questioning to the facts raised in the case-in-chief and ruled that Krisor's "opinion as to charge or not to charge is not at all relevant." Pelley argues that Krisor's opinion is relevant to why the State waited thirteen years to charge Pelley, and that the trial court erred by not permitting Pelley to question Krisor about his opinion.

The trial court did not err in excluding evidence of Krisor's opinion because this opinion was inadmissible under Indiana Rule of Evidence 704(b), which prohibits a witness in a criminal case from testifying to "opinions concerning intent, guilt, or innocence" or "legal conclusions." Whether there was enough evidence to charge Pelley is an inadmissible opinion of a legal conclusion. Moreover, Krisor's opinion as to the sufficiency of evidence to charge Pelley is protected by the work-product privilege. <u>Averhart v. State</u>, 614 N.E.2d 924, 927 (Ind. 1993) (per curiam) ("Delving into the inner workings of the prosecuting attorney's office at the time of preparation for trial would of course be invading the work-product privilege.").

15

## IV. Petition for Special Prosecutor

Pelley was charged on August 7, 2002 while Christopher Toth was serving as St. Joseph County Prosecutor. In November 2002, Michael Dvorak was elected to that position. Dvorak was sworn in on January 1, 2003 and inherited the Pelley prosecution. On January 3, Dvorak advised the trial court that he had met with Pelley while in private practice. Dvorak disclosed that after the murders, he was visited by Pelley and Pelley's grandfather. Dvorak believed that Pelley was interviewing several attorneys before choosing counsel, and Pelley did not retain Dvorak. Dvorak stated that he had no independent recollection of what was said in the meeting, but believed he received no confidential information from Pelley. Dvorak had no further contact with Pelley.

On January 7, Pelley petitioned for appointment of a special prosecutor. Pelley's verified petition states that

> in May, 1989, at which time he was a practicing attorney in South Bend, Indiana, Michael A. Dvorak interviewed [Pelley] regarding the events surrounding the murder of his family, murders which [Pelley] was then and there suspected of having committed. By reason thereof, Michael A. Dvorak obtained knowledge of facts that directly relate to the charges now pending against [Pelley].

Pelley asserted that a special prosecutor was necessary to avoid a conflict of interest and the appearance of impropriety.

The parties stipulated to the statements made in Dvorak's disclosure and Pelley's verified petition. The trial court denied Pelley's motion, finding that Pelley failed to establish that Dvorak obtained confidential information creating an actual conflict of interest, and that the applicable Indiana statute does not require appointment of a special prosecutor to avoid the appearance of impropriety, if there is no showing that confidential information was shared.

Pelley argues that the trial court erred in denying his petition for a special prosecutor. Appointment of a special prosecutor is prescribed by statute.[6] Indiana Code section 33-39-1-6(b)(2) provides that the trial court may appoint a special prosecutor if it finds by "clear and convincing evidence" that appointment is necessary to avoid an "actual conflict of interest." Pel-

---

[6] At the time of Pelley's motion, the relevant statute, Ind. Code § 33-39-1-6, was located at 33-14-1-6. Subsection (a)(2) relevant to Pelley's petition has not been amended.

16

ley contends that this section is to be read in conjunction with Indiana Professional Conduct Rule 1.18, which addresses communications by prospective clients.

In effect, Pelley argues for application of a rigid rule that the appearance of impropriety is offended without any showing as to the nature or substance of the communication between the prospective client and the attorney. Pelley contends that a requirement of actual harm would force him to choose between a conflict-free prosecutor and his right to attorney-client confidentiality. In a similar vein, Pelley urges that permitting former defense attorneys to pursue cases against former prospective clients compromises the integrity of the judicial process. A rigid standard has been used by some courts as the test of an impermissible conflict. Restatement (Third) of The Law Governing Lawyers § 121 cmt. c(iv) (1998). But even the more restrictive standard permits a lawyer to "represent a client with interests adverse to those of the prospective client" if the lawyer has not "received from the prospective client information that could be significantly harmful if used in the matter." Ind. Professional Conduct Rule 1.18 cmt. 6. Moreover, more recent authority relaxes the appearance of impropriety standard, noting that "avoiding conflicts of interest can impose significant costs on lawyers and clients. Prohibition of conflicts of interest should therefore be no broader than necessary." Restatement (Third) of the Law Governing Lawyers § 121 cmt. b. In the context of prospective clients, a conflict occurs not because of the fact of consultation, but because of the passing of confidential information from the prospective client to the lawyer. Id. § 15 cmt. c ("[P]ersonal disqualification of a lawyer who deals with a prospective client occurs only when the subsequent matter presents the opportunity to use information obtained from the former prospective client that would be 'significantly harmful.'").

These general principles are further modified by the specific provision of Indiana law governing the need for a special prosecutor. We have long held that appointment of a special prosecutor is governed by a standard that differs from that used in the civil context. Kubsch v. State, 866 N.E.2d 726, 732 (Ind. 2007) (citing Johnson v. State, 675 N.E.2d 678, 682 (Ind. 1996)). Specifically, for a prosecutor's previous involvement with the defendant to merit disqualification, there must be some showing that the prosecutor received confidential information that could assist the prosecution. Id. A more demanding showing is required because our elected prosecutors often possess criminal defense experience. Particularly in smaller communities, the limited

17

pool of lawyers available to represent defendants faced with serious criminal charges overlaps with the pool of candidates for county prosecutor.

Here, we have a prosecutor with no memory of the consultation who believes that he received no confidential information. Pelley states that he discussed some of the facts with Dvorak but provides no further explanation, and does not claim that he communicated any confidential information. The trial court was within its discretion to deny Pelley's petition for a special prosecutor.

## Conclusion

Pelley's convictions are affirmed.

Shepard, C.J., and Dickson, Sullivan, and Rucker, JJ., concur.