**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**MARK S. LENYO**
South Bend, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JOSEPH Y. HO**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ELEX BALTAZAR, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No.  71A03-1111-CR-545 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE ST. JOSEPH SUPERIOR COURT
The Honorable Jane Woodward Miller, Judge
Cause No.  71D01-1006-MR-4

**July 30, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**DARDEN, Senior Judge**

Elex Baltazar appeals his conviction for murder, a felony.[1]

We affirm.

ISSUE

Whether there is sufficient evidence to support the conviction.

FACTS

Melanie Tilley met Miguel Rivera in June of 2008, and the two became friends. At some point, Tilley rented a room in her house to Rivera. In early May of 2010, however, Rivera moved out of Tilley's house after he failed to pay her rent. Around that time, Rivera began doing construction for Tilley's uncle, Jose Rodriguez, and moved into a house, located on Bowman Street in South Bend and owned by Rodriguez. Baltazar also lived in the house.

Shortly after Rivera had moved out of Tilley's house, he arranged to meet her in order to pay her the rent he owed; however, he did not show up as planned. The next day, Rodriguez telephoned Tilley and informed her that Rivera was missing. Tilley contacted several law enforcement agencies but "got the run around." (Tr. 181).

During the afternoon of May 27, 2010, officers with the Elkhart Police Department responded to a report of a body floating in the Elkhart River, on the north side of Elliot Park. Responding officers observed what appeared to be a body wrapped in blankets "hung up" on trees and debris approximately seven to eight feet from the river's

---

[1] Ind. Code § 35-42-1-1.

2

edge. (Tr. 154). A dive team eventually recovered the body from the river. Using fingerprints, officers identified the body as that of Rivera.

After identifying Rivera, detectives with the Elkhart County Sheriff's Department interviewed Rodriguez. He informed detectives that shortly after he last saw Rivera in early May, he went to the Bowman Street residence to pick up Rivera and Baltazar to take them to a construction site. When he got to the house, Baltazar was mopping the kitchen floor, which was "soaking wet." (Tr. 371). Baltazar informed Rodriguez that he had spilled water from the coffee pot. Rodriguez also noticed that one of the interior walls had been painted despite having been recently painted.

After interviewing Rodriguez, detectives went to the Bowman Street residence. There, they encountered Baltazar, "doing some work on the house." (Tr. 252). Baltazar acknowledged that he and Rivera were roommates and the only two living at the house. Baltazar informed the detectives that he had last seen Rivera the evening of May 25, 2010, and that Rivera had been sitting near the fire pit in the house's front yard. According to Baltazar, when he woke up the next morning at approximately 7:30 a.m., he found that "all of [Rivera]'s belongings had been packed up and stuffed into the corner of the living room," which doubled as Rivera's bedroom. (Tr. 257).

Baltazar told the detectives that a maroon van, which was parked in front of the residence, belonged to Rodriguez but was used by Rivera. He then retrieved the key to the van from the living room and unlocked the van for the detectives. Initially, detectives observe what appeared to be sand and twigs on the front passenger seat.

3

While they were speaking with Baltazar, the detectives observed a couch cushion on the house's front porch. Baltazar informed one of the detectives that he had found the cushion on a trailer parked outside the house the morning after he last saw Rivera. He then moved it to the front porch. Baltazar indicated that the cushion belonged to one of the couches in the living room. Subsequently, however, Baltazar told another detective at the scene that he had put the couch cushion outside "to clean because a friend's child had came [sic] over and urinated on it . . . ." (Tr. 287). When asked about the coffee pot, Baltazar told the detectives that he had discovered water on the floor the morning after he last saw Rivera.

Baltazar then allowed the detectives into the house, where they observed Rivera's belongings piled in a corner. Baltazar subsequently informed detectives that he had last seen Rivera on or about May 11, 2010.

Given Baltazar's inconsistent statements, the detectives asked him to accompany them to the Sheriff's Department; he agreed. After interviewing Baltazar further, the detectives returned to the South Bend residence to conduct a search. As the detectives awaited the issuance of the search warrant, Detective John Perry looked inside Rivera's van. In plain view, he saw "a large amount of white sand on the seat, which appeared consistent with sand that was in the front yard of the residence . . . , and there also appeared to be blood on the passenger side rear seat." (Tr. 238).

4

During their search of the Bowman Street residence's curtilage, officers discovered a cell phone lying in a burn pit. Officers, however, could not retrieve any information from the cell phone due to fire damage.

A search of an outbuilding revealed an aluminum baseball bat, leaning against a cabinet. Officers observed a red stain on the cabinet, near where the baseball bat had been leaning. (Tr. 435). Officers found a second baseball bat in the residence's basement. Officers also collected the van's ignition key from inside the residence. Laboratory tests later revealed the presence of blood on the cabinet, second baseball bat, and the key.

Officers observed that an interior wall near the entrance to the kitchen had been recently painted and noted blood spatter on the living room's wall, two couches and end table. An examination of the kitchen floor revealed several droplets of blood, some of which had been diluted with "another liquid, most likely water." (Tr. 477). The DNA profile subsequently taken from several samples of blood found in the van and throughout the residence, including the blood found on the second baseball bat, matched Rivera's DNA profile.

Tests performed on blood samples taken from behind a baseboard on the living room wall revealed the presence of DNA from Rivera and a second unidentified individual. Tests, however, could not confirm whether the DNA from the second individual came from blood or other biological matter, such as skin cells.

Dr. Joseph Prahlow, a forensic pathologist, conducted an autopsy of Rivera on May 28, 2010. He found that Rivera had been wrapped in three blankets and bound at the feet and neck with wire. A belt had been fastened at the waist and a wire hanger wrapped around the neck area. Rivera wore only a pair of underwear, a t-shirt, and a chain around his neck with a key and a dog tag on it. Rivera "was in a state of decomposition" and "had been in the water for some time." (Tr. 164).

The autopsy revealed that Rivera had "a large laceration . . . on the left back of the scalp, behind his left ear, with associated bleeding under that." (Tr. 206-07). The autopsy also revealed hemorrhaging caused by a "traumatic brain injury." (Tr. 207). Dr. Prahlow found that Rivera "had a fracture or broken left jaw bone, his mandible" as well as "extensive bruising of the skin on the whole left side of the scalp, the cheek, the face and the neck, with extension to the front of the neck." (Tr. 207). Dr. Prahlow determined that blunt force trauma had caused the multiple injuries but also could not "rule out the possibility of asphyxia type of forces on the neck" in addition to blunt force trauma, given the extensive bruises on the neck. (Tr. 211). Dr. Prahlow opined that Rivera has suffered "at least two impacts" to the left side of the head and that the injuries were consistent with those caused by a baseball bat. (Tr. 212).

Dr. Prahlow concluded that Rivera "died from blunt force injuries of the head and face, with the caveat that there may be another mechanism, namely, asphyxia injuries, on top of that." (Tr. 214). Dr. Prahlow further concluded that "[t]he manner of death was homicide." (Tr. 216). Dr. Prahlow, however, could not determine the time or date of

6

death, although the degree of decomposition was consistent with death occurring in early May of 2010.

On June 1, 2010, the State charged Baltazar with murder, a felony. The trial court commenced a five-day jury trial on September 13, 2011. During the trial, Peter Perez testified that in June and July of 2010, he had shared a cell in the St. Joseph County Jail with Baltazar. Perez further testified that Baltazar had told Perez that after he and Rivera had gotten into a fight, he waited until Rivera fell asleep on the couch before hitting him with a baseball bat. Perez also testified that Baltazar admitted to loading Rivera's body into Rivera's van, tying up Rivera's body, and dumping him in the river.

The jury found Baltazar guilty as charged. Following a sentencing hearing on November 1, 2011, the trial court sentenced Baltazar to fifty-years in the Department of Correction.

<u>DECISION</u>

Baltazar asserts that the evidence is insufficient to support his conviction, "where the State produced no direct evidence linking [him] to the murder." Baltazar's Br. at 15.

> When reviewing the sufficiency of the evidence to support a conviction, appellate courts must consider only the probative evidence and reasonable inferences <u>supporting</u> the verdict. It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. To preserve this structure, when appellate courts are confronted with conflicting evidence, they must consider it most favorably to the trial court's ruling. Appellate courts affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. It is therefore not necessary that the evidence overcome every reasonable hypothesis of

7

innocence. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict.

*Drane v. State*, 867 N.E.2d 144, 146-47 (Ind. 2007) (quotations and citations omitted). We will sustain a judgment based on circumstantial evidence alone if the circumstantial evidence supports a reasonable inference of guilt. *Pelley v. State*, 901 N.E.2d 494, 500 (Ind. 2009), *reh'g denied*.

Here, the evidence shows that Rivera sustained blunt force trauma to the head. Furthermore, the evidence shows the presence of Rivera's blood throughout the house he shared with Baltazar and that the pattern of the blood found in the living room was consistent with Rivera having sustained blows to the head. Officers also discovered a baseball bat, with Rivera's blood on it, in the basement of the home. Dr. Prahlow testified that the injuries suffered by Rivera were consistent with those caused by a baseball bat.

In addition, the jury heard testimony that Baltazar had repainted one of the living room's walls despite it having been recently painted. Furthermore, Baltazar had painted only a portion of one wall, and the wall was located near where the majority of the blood spatter had been detected. Rodriguez testified that the morning after he last saw Rivera, he found Baltazar mopping the floor of the Bowman Street evidence. The jury also heard testimony that Baltazar gave conflicting accounts about when he last saw Rivera and what had necessitated mopping the floor.

8

Finally, Perez testified that Baltazar had admitted to killing Rivera by striking him with a baseball bat; loading Rivera's body into Rivera's van; and then dumping Rivera's body in the river. A forensic analysis confirmed the presence of Rivera's blood in the van and on the van's ignition key.

Given the evidence in this case, the jury could reasonably infer that Baltazar committed the murder of Rivera. Baltazar's argument to the contrary amounts to an invitation to reweigh the evidence, which we will not do.

Affirmed.

NAJAM, J., and RILEY, J., concur.