## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 11 2018, 5:29 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mary P. Lake
La Porte, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

James B. Martin
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Alan Cornelius Landry, *Appellant-Defendant,* | June 11, 2018 |
| v. | Court of Appeals Case No. 46A03-1710-CR-2373 |
| | Appeal from the LaPorte Superior Court |
| State of Indiana, *Appellee-Plaintiff.* | The Honorable Michael S. Bergerson, Judge |
| | Trial Court Cause No. 46D01-1611-MR-7 |

**Kirsch, Judge.**

[1]    Alan Cornelius Landry "Landry" was convicted of murder,[1] a felony, for killing Nekia Hyler ("Hyler"). He appeals his conviction, contending that the State failed to present sufficient evidence to support his conviction.

[2]    We affirm.

## Facts and Procedural History

[3]    In April 2015, Hyler and her daughter were living at the Stepping Stones Women's Shelter ("Stepping Stones") in Michigan City, Indiana. *Tr. Vol. 2* at 90. Hyler's case manager, Marsha Daniel ("Daniel"), saw Hyler on the morning of April 13, 2015, for a group session. *Id*. at 93-94. After the group session, Hyler came into Daniel's office and talked with Daniel for approximately forty-five minutes about some things that had been concerning to Hyler. *Id*. at 93-95. Hyler told Daniel she was going to meet someone, and Daniel recalled that Hyler said the man's name was "something like Martinez." *Id*. at 94. Hyler was crying and told Daniel that she was scared and that this would probably be the last time Daniel would see her alive because she thought she was pregnant and was going to tell the father. *Id*. Hyler never returned to Stepping Stones. *Id*. at 96-97.

[4]    Hyler visited her friend, Roberta Jenkins ("Jenkins") that morning, arriving at noon. *Id*. At 70-71; *State's Exs*. 104, 106. Hyler received a phone call from Landry while she was at Jenkins's home. *Id*. at 72; *State's Exs*. 104, 106.

---

[1] *See* Ind. Code § 35-42-1-1(1).

Jenkins heard the caller's voice, and Hyler showed Jenkins a picture of him. *Tr. Vol. II*. at 75, 79. Jenkins recognized the caller as a man she knew as "Adoffo." *Id*. at 79, 86-87. While Hyler was speaking on the phone with Landry, she began asking Landry questions about his identity, and Landry became agitated. *Id*. at 78. Jenkins also stated that she saw Landry when he visited Hyler on Jackson Street in Michigan City in either 2011 or 2012. *Id*. at 79-80. She warned Hyler that Landry was not good news and that Hyler should "keep your distance mind your business." *Id*. at 77. Hyler assured Jenkins she was going to "fall back, she wasn't even going to go nowhere she was going straight to go get her baby." *Id*. at 77.

[5] Shortly after noon that day, Hyler had been exchanging messages on Facebook with her friend, Bert McMullan ("McMullan"). *State's Ex*. 79. McMullan and Hyler had not spoken for about six months, but he saw correspondence between Landry and Hyler on Facebook. *Id*. at 92, 95. McMullan could tell from Facebook correspondence that there was something romantic going on between his own fiancée and Landry. *Id*. at 93. From viewing Landry's Facebook profile pictures, McMullan noticed that Landry identified himself with various names: Alan Patricia; Martiz Dorsey; and Adoffo Lord. *Id*. at 96. Hyler indicated to McMullan that Landry's actual name was "Marquis" Landry. *State's Ex*. 79. McMullan learned from Hyler that Landry was married and planned to tell Landry's wife about Landry's affairs. *Tr. Vol. 3* at 99. McMullan eventually contacted Landry, advising him that McMullan's fiancée

"played" not only McMullan but Landry too, as she was "dealing with other men." *Id*. at 100-02.

[6] As Hyler was leaving Jenkins's home, she received two text messages from Landry. *State's Exs*. 83, 104, 106. Hyler responded that she was at Gardena Park. *State's Ex*. 83. Landry called Hyler twice between 2:06 to 2:08 p.m. *Id*. At 2:08 p.m., Google GPS records showed that Hyler was at the 300 block of Holliday Street, where her body would later be found. *Tr. Vol. 4* at 191; *State's Exs*. 104, 106. From 2:10 to 2:18, Hyler exchanged Facebook messages with McMullan saying, "He is following me now." *State's Exs*. 79, 104, 106. At 2:15 p.m., Hyler sent McMullan a picture she took of an African-American male standing in the alleyway facing her car. *State's Exs*. 79, 81. McMullan responded, "Pull off … That's some stalker s\*\*t . . . Don't f\*\*k around." *State's Exs*. 79, 104, 106. At 2:18 p.m., Hyler responded, "You right." *State's Exs*. 79, 104, 106.

[7] At 2:21 p.m., Google GPS records show that Hyler's cell phone was at 8th and Spring Street in Michigan City. *State's Exs*. 104, 106. Landry picked up his child at the Head Start program at that same address at approximately 2:20 to 2:25 p.m. *Tr. Vol. 4* at 65, 82. Images from surveillance cameras located approximately one mile away showed Landry's vehicle passing by, going southbound at 2:26 p.m., and then northbound at 2:33 p.m. *Id*. at 54; *State's Exs*. 95, 96. Google GPS records show that, at 2:27 p.m., Hyler's cell phone was at a location adjacent to Hearts & Hands childcare. *State's Exs*. 104, 106.

Landry picked up his other daughter from Hearts & Hands childcare at 2:30 p.m. *State's Ex*. 100; *Tr. Vol. 2* at 173-76.

[8] From 2:29 p.m. to 2:58 p.m., Facebook messages purporting to be from Hyler were sent to McMullan. *State's Ex*. 80. Portia Rice ("Rice"), Hyler's sister, last spoke with Hyler on the telephone at approximately noon while Hyler was at Jenkins's home. *Tr. Vol. 2* at 143. Just after 3:00 p.m., Rice began receiving odd text messages from Hyler's phone. The first of the messages stated, "Girl . . . I'm about to get this 2,500 from this . . . [derogatory term] Bert . . . he owe me for taking care of some business"; "He had me doing some private investigator type s**t b***h." *State's Exs*. 2, 104, 106. Rice and Hyler never referred to one another as "b***h". *Tr. Vol. 2* at 125. Rice also found it odd that Hyler referred to Bert McMullan using a derogatory term because McMullan was a friend to both her and Hyler. *Id*. at 130. At 3:09 p.m., a text message was sent to Landry's cell phone from Hyler's phone with three nude photographs of Hyler as attachments. *State's Exs*. 104, 106; *Tr. Vol. 4* at 194.

[9] The last communication sent from Hyler's phone was a text message to Rice at 3:11 p.m. *State's Exs*. 104, 106. The final two GPS location points generated from Hyler's phone were at 3:03 and 3:04 p.m., at Walker and Vail Streets and Holliday and Vail Streets. *State's Exs*. 104, 106. Landry's residence at 335 Walker Street is on the southeast side of the intersection of Walker and Vail. *Tr. Vol. 4* at 191.

[10]  Because of the odd text messages referencing McMullan, Rice contacted McMullan. He informed Rice about his interactions with Hyler and provided her with screen shots of Facebook conversations that he had with Hyler. *Tr. Vol. 2* at 134; *Tr. Vol. 4* at 177. The next day, April 14th, 2015, Rice went to police to file a missing person report for Hyler. *Tr. Vol. 2* at 56-57. Rice provided police with passwords to access Hyler's Facebook account and her Badu dating site account. *Id*. at 57; *Tr. Vol. 4* at 177.

[11]  At approximately 6:00 p.m. on April 14, 2015, police were called to 314 Holliday Street with a report that a person was slumped over inside a vehicle. *Tr. Vol. 2* at 151. The person was identified as Hyler, and it was determined that she had died from a gunshot wound to her neck. *Tr. Vol. 2* at 148. Police determined that she was shot by a person standing outside the vehicle, through the open driver's side window and that, at the time of the shooting, there was no occupant in the front seat. *Tr. Vol. 2 at 203-204.* Hyler was in the driver's seat of her blue Chevrolet Malibu which was parked in the same alley from which she had sent the picture to McMullan of the man standing facing her car. *Tr. Vol. 2* at 151, 186, 192; *Tr. Vol. 4* at 178-79. A cassette audio adapter wire extended from the car's cassette player to outside the window of the driver's side door indicating that a person standing outside the driver's side of the car had pulled it out and detached it. *Tr. Vol. 2* at 211-13. An earring matching the one in Hyler's right ear was found in the alleyway approximately 30 feet away from the vehicle. *Tr. Vol. 2* at 186, 198.

[12] On April 15, 2015, Landry was taken into custody for questioning. A cellphone and the clothing he was wearing were recovered from his possession. *Tr. Vol. 3* at 44. Other cellphones, firearms, and clothing were obtained in a search of Landry's home and vehicle. *Id.* at 61, 66, 70, 73-74. No blood was found on any of Landry's clothing that was collected. *Tr. Vol. 2* at 237. Landry told detectives that he and Hyler had "hooked up" before, that she knew he was married with a family, and that he thought she wanted him to "chase her." *Id.* Landry stated that he and Hyler had met in alleys to have sex on previous occasions. *Id.* He denied having been in the alley on April 13, 2015 and said that he spoke with Hyler for approximately five minutes at the Duke Gas Station on School Street. *Tr. Vol. 4* at 171; *State's Ex.* 91. He said he and Hyler discussed "hooking up," but that it would have to be later because his wife worked until after 6:00 p.m. *State's Ex.* 91. Landry claimed that after this five minute conversation with Hyler, he went to pick up his daughter at the Head Start program, but was early and went to the Hearts & Hands daycare to get his other child, then went back to Head Start. *Tr. Vol. 4* at 175; *State's Ex.* 91. Landry told detectives that he texted Hyler later, but that he never heard back from her. *State's Ex.* 91. Landry repeatedly insisted he could not have been the last person to call Hyler, but officers had not disclosed any information regarding when Hyler's body had been found. *State's Ex.* 91. When one of the detectives disclosed to Landry that Hyler had been found dead, Landry responded that Hyler had just sent him some pics, referring to the text message sent from Hyler's cell phone at 3:09 p.m. *Tr. Vol. 4* at 194-95; *State's Ex.* 91. When he spoke with detectives, Landry wore a grey hat, a zip-up sweatshirt,

and a grey t-shirt, similar to the individual in the picture Hyler sent to McMullan from the alleyway in the 300 block of Holliday. *State's Ex.* 91. Police searched Landry's residence and found a picture of a Smith and Wesson .38 caliber revolver in Landry's cell phone.

[13] A single bullet and fragments were removed from Hyler's body during the autopsy. *Tr. Vol. 2* 215; *State's Exs.* 26, 108. The ballistics exam of the bullet showed that it was a .38 caliber family with five lands and grooves with a right hand twist. *Tr. Vol. 3* at 191-92. The firearms found in Landry's home and vehicle were ruled out as having fired the bullet recovered from Hyler's body. *Id.* at 193-94. Evidence recovered from Landry's cellphone showed pictures of other firearms not recovered from his home and vehicle. *State's Exs.* 84-87. One of the weapons depicted was a Smith & Wesson revolver, which could have fired the bullet. *Tr. Vol. 3* at 179, 194; *State's Ex.* 85.

[14] The State charged Landry with murder and alleged that he was an habitual offender. *Appellant's App. Vol. 2* at 13-14, 44-45. The jury found Landry guilty of murder and determined that he was a habitual offender. *Id.* at 179, 181, 183-84. The trial court imposed a sentence of sixty years, enhanced by fifteen years based on the habitual offender adjudication. *Id.* at 188-92. Landry now appeals.

## Discussion and Decision

[15] Landry argues that the evidence presented at trial by the State was insufficient to sustain his murder conviction. When reviewing the sufficiency of evidence

to support a conviction, we do not reweigh the evidence or assess the credibility of the witnesses. *Boggs v. State,* 928 N.E.2d 855, 864 (Ind. Ct. App. 2010), *trans. denied.* We consider only the evidence most favorable to the verdict and the reasonable inferences that can be drawn from that evidence. *Fuentes v. State,* 10 N.E.3d 68, 75 (Ind. Ct. App. 2014), *trans. denied.* We also consider conflicting evidence in the light most favorable to the trial court's ruling. *Oster v. State,* 992 N.E.2d 871, 875 (Ind. Ct. App. 2013), *trans. denied.* We will affirm unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Lock v. State,* 971 N.E.2d 71, 74 (Ind. 2012).

[16] In order to convict Landry of murder, the State was required to prove beyond a reasonable doubt that Landry did knowingly or intentionally kill Hyler. Ind. Code § 35-42-1-1(1).

[17] Landry argues that there was no substantial evidence of probative value to support the verdict of guilty beyond a reasonable doubt, that there was no direct evidence linking him to Hyler's murder and that the State only presented circumstantial evidence at trial. He further contends that the State did not produce an eyewitness or a murder weapon, that there was no DNA evidence, blood evidence, fingerprint evidence, and ballistics linking him to the crime and that none of Hyler's belongings, including her cellphone, were found in his possession. Landry maintains that the probative evidence and the reasonable inferences drawn from the evidence, when viewed in a light most favorable to the conviction, failed to support the verdict of guilty beyond a reasonable doubt. We disagree.

[18] Hyler was shot with a revolver. While the murder weapon was never found, police located a picture on Landry's cellphone that had been taken on March 21, 2015 of a Smith & Wesson .38 caliber revolver which could have been the weapon that fired the bullet fragments removed from Hyler during the autopsy.

[19] A murder conviction may be based purely on circumstantial evidence as long as a reasonable inference can be drawn from the circumstantial evidence to support the verdict. *Pelley v. State*, 901 N.E.2d 494, 500 (Ind. 2009); *Moore v. State*, 652 N.E.2d 53, 55 (Ind. 1995). In this case, the circumstantial evidence reveals: (1) specific and continuous satellite location of Hyler's cell phone that tracked Landry's movements contradicted Landry's claim that he only briefly talked to her at a gas station; (2) the crime scene that was consistent with Hyler's cell phone being pulled away from a dash connection; and (3) a picture of a person with an appearance generally consistent with Landry standing in the alleyway facing Hyler's car that Hyler had taken and sent to McMullan.

[20] During his interview with police, Landry stated that he met with Hyler on April 13, 2015 for only five minutes at a Duke Gas Station, went to pick up his daughter from Head Start and then went home to get his oldest daughter from the school bus. *Tr. Vol. 4* at 171, 175; *State's Ex.* 91. However, Hyler's GPS on her phone indicated that she never stopped at the Duke Gas Station, but moved right past the Duke Gas Station to the middle of the alley in the 300 block of Holliday Street where she was later found dead. The text messages and calls in which Hyler provided her current whereabouts to Landry and Hyler's Facebook messages to McMullen, stating, "He is following me now"—were sufficient for

the jury to infer that Landry and Hyler did not meet at the Duke Gas Station, but instead, met in the alley in the 300 block of Holliday Street where, shortly thereafter, she was killed by Landry.

[21] The crime scene indicated that Hyler's cell phone was taken by the person who killed her. Utilizing GPS data on the phone, Landry's location was established. It indicated that Hyler's phone went from the crime scene, to the Head Start program, Hearts & Hands childcare, and Landry's residence on Walker Street. Google's GPS services showed Hyler's phone traveling north and south on Tilden Avenue. Surveillance footage from 801 Tilden Avenue showed Landry's car traveling north and south on Tilden with no other vehicles following him. This evidence was sufficient for the jury to reasonably infer that Landry murdered Hyler and took her phone.

[22] Furthermore, the evidence was sufficient for the jury to reasonably infer that the picture that Hyler sent to McMullan just before her death was Landry. The picture showed a person with an appearance consistent with Landry standing in the alleyway facing Hyler's car. When Landry was interviewed by the police, he was dressed in similar clothing to what the individual from the picture was wearing: grey hat; zip-up sweatshirt; and a grey t-shirt.

The evidence directly supported the verdict of guilty beyond a reasonable doubt and was sufficient to support Landry's conviction.

[23] Affirmed.

Baker, J., and Bradford, J., concur.